**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| BOLTEX MANUFACTURING COMPANY, L.P. and WELDBEND CORPORATION, | ) ) ) | CASE NO. 4:17-cv-1400 |
| | ) | **JURY DEMAND** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ULMA FORJA, S.COOP. a/k/a ULMA PIPING and ULMA PIPING USA CORP., | ) ) ) | |
| Defendants. | ) | |

## ORIGINAL COMPLAINT

Boltex Manufacturing Company, L.P. ("Boltex") and Weldbend Corporation ("Weldbend") (collectively hereafter, "Plaintiffs"), by and through their attorneys, hereby state as follows for their Complaint against Defendants, Ulma Forja, S. Coop. a/k/a Ulma Piping ("Ulma") and Ulma Piping USA Corp. ("Ulma USA") (collectively hereafter, "Defendants").

## I.    INTRODUCTION

1.    This is an action for false advertising and unfair competition. Plaintiffs and Defendants compete in the market for **normalized** carbon steel flanges. Flanges are important components of pipeline systems, and their integrity and compliance with stated specifications can mean the difference between a well-functioning system and a catastrophic failure. "Normalization" is a heat treatment process that changes the physical composition of carbon steel, making the grains in its crystalline structure smaller and more uniform. This process relieves stresses in the steel, and makes it more machinable and tougher than in its non-normalized state. Normalized flanges also cost more to make than non-normalized flanges. Defendants, however, undersell and unfairly compete with Plaintiffs by advertising their flanges as "normalized" when

they are not normalized. Defendants' false advertising misleads customers into buying something that is not what it purports to be. Plaintiffs bring this Complaint to put a stop to Defendants' false and misleading advertising.

## II.    THE PARTIES

2.    Plaintiff Boltex is a limited partnership organized and existing under the laws of the State of Texas. Boltex's principal place of business is 4901 Oates Rd., Houston, Texas 77013. Boltex is a vertically-integrated manufacturer of high quality, American-made carbon steel flanges for the oil and gas, petrochemical, transmission, engineering and construction industries. Boltex has the capability to perform all forging, machining, heat-treating and testing operations involved in the manufacture of flanges at its 315,000 square foot forging and 195,000 square foot machining facilities in Houston. Boltex employs approximately 175 people in Houston. Boltex's current forging capacity greatly exceeds 3,000 tons per month and it has a machining capacity exceeding 2,000 tons a month. In its machining facility, Boltex houses one of the largest finished flange and rough forging inventories of any major domestic flange producer. Boltex's flanges are sold to customers throughout the U.S. through third-party distributors.

3.    Plaintiff Weldbend is a family-owned corporation organized and existing under the laws of the State of Delaware. Weldbend's principal place of business is 6600 South Harlem Ave., Argo, Illinois 60501, where it operates facilities comprising 315,000 square feet. Weldbend has approximately 170 employees. Weldbend produces and distributes high quality American-made carbon steel fittings and flanges. Weldbend purchases flange forgings from Boltex and others that it machines into finished flanges for marketing, distribution and sale to customers throughout the United States. Weldbend is presently one of the largest manufacturers of finished carbon steel

flanges in the United States.  Weldbend's flanges are sold to customers throughout the U.S. through third-party distributors.

4.     Defendant Ulma is a flange manufacturing cooperative company, with its principal place of business at Barrio Zubillaga No. 3, 20560 Oñati (Gispuzkoa), Spain.  Ulma is a member of the Ulma Group comprising eight member businesses in various industrial sectors.  Ulma is a manufacturer of a variety of forged products, including carbon steel flanges.  Ulma's carbon steel flanges are sold in the United States and worldwide through various distributors, including but not limited to Ulma USA.

5.     Defendant Ulma USA is a corporation organized under Texas law with its principal place of business at 9731 Wortham Blvd., Suite 101, Houston, Texas  77065.  Upon information and belief, Ulma USA is the North American sales office and representative for Ulma.

### III.     JURISDICTION AND VENUE

6.     This action arises under section 43 of the Lanham Act, Title 15 of the United States Code § 1125, and common law of unfair competition.  This Court has original jurisdiction over the subject matter of this lawsuit under 28 U.S.C. §§ 1331, 1338 and 15 U.S.C. § 1121(a), because it arises under the Lanham Act.

7.     This Court has subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 and the doctrine of supplemental jurisdiction, because the subject matter is so related to the claims asserted under federal law as to form part of the same case or controversy.

8.     The exercise of personal jurisdiction over Ulma USA in Texas is proper because it is a corporation organized under Texas law with its principal place of business in Houston, Texas. The exercise of personal jurisdiction over both Ulma USA and Ulma in Texas is proper because acts giving rise to Plaintiffs' causes of action have occurred in the State of Texas and more

particularly, within the Southern District of Texas.  More specifically, Ulma and Ulma USA market, promote, advertise, offer for sale, sell, and/or distribute their purportedly normalized carbon steel flanges to customers throughout the United States and throughout the State of Texas, including in the Southern District of Texas.  Defendants have also purposefully and voluntarily placed their purportedly normalized carbon steel flanges into the stream of commerce with the expectation that they will be purchased by customers throughout the United States and throughout the State of Texas, including in the Southern District of Texas.  Defendants have also purposefully and voluntarily directed false and misleading advertising and promotion throughout the United States and throughout the State of Texas, including in the Southern District of Texas.  Customers have purchased and continue to purchase Ulma's purported normalized carbon steel flanges throughout the United States and throughout the State of Texas, including in the Southern District of Texas.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because a substantial part of these events or omissions giving rise to this action have occurred and/or will occur in this District and Defendants reside in this District.

## IV.      FACTUAL BACKGROUND

### A.      THE PRODUCTS AT ISSUE—CARBON STEEL FLANGES

10.      Carbon steel flanges have important and often mission-critical uses in the oil and gas, petrochemical, transmission, engineering and construction industries, among others.

11.      A flange is a disc, collar or ring that attaches to a pipe, providing a method of connecting pipes, valves, pumps and other equipment to form a piping system.  Flanges provide easy access to piping systems for cleaning, inspection or modification.  Typical flange types include weld neck flanges, slip-on flanges, socket weld flanges, lap-joint flanges, threaded flanges and blind flanges, some of which are pictured below (individually and in actual use):



12.     Flanges are also made with various differentiators including facings, number of bolt holes, and pressure classes.[1]  Flanges may be manufactured in specific dimensions provided by the customer or they may be made according to published specifications.  Finally, flanges can be manufactured using various materials.  Carbon steel, which is strong, durable, and relatively low in cost, is the most commonly used material for flanges.

**B.     THE PROPERTIES OF CARBON STEEL**

13.     Carbon steel is a metal alloy that combines iron and carbon, along with other elements such as nickel, chromium and manganese in small quantities.

---

[1] Carbon steel flanges are made in seven primary pressure classes:  150, 300, 400, 600, 900, 1500 and 2500.  The pressure class is expressed in pounds, although the pressure a flange can withstand varies with temperature (as temperature increases, the pressure capability decreases).  Flanges in higher pressure classes can withstand more pressure than flanges in a lower class, i.e., a class 300 flange can handle more pressure than a class 150 flange under the same conditions.

14.     Steel has a crystalline "microstructure" that is visible only with magnification. These tiny crystals are formed in the solid material when carbon steel solidifies from its molten state.  These crystals in turn form "grains" in the solid material, examples of which can be seen in the image below.



Image at 200x magnification

15.     Steel's base metal is iron, which takes on one of two crystalline forms (body centered cubic or face centered cubic) depending on its temperature.  The interaction of these different crystalline forms with the alloying elements gives steel its range of properties.

16.     At room temperature, the most stable form of pure iron is "alpha iron," a body centered cubic (BCC) structure with 9 atoms.  Alpha iron can only dissolve a small concentration of carbon.  The inclusion of carbon in alpha iron is called ferrite.



17.     While carbon is almost insoluble in alpha iron, carbon becomes quite soluble in iron that is heated above the lower transformation temperature.   At the lower transformation temperature, alpha iron begins to transform from its BCC crystalline structure into gamma iron with a face-centered cubic (FCC) structure having 14 atoms.   At the upper transformation temperature, the transformation of the crystalline structure from BCC to FCC is complete.   The inclusion of carbon in gamma iron is called austenite.



18.     Because of its structure, austenite can dissolve considerably more carbon than ferrite.

19.     As austenite cools below the upper transformation temperature, the structure of the material attempts to revert back to the BCC structure.   The carbon atoms no longer fit within the structure, resulting in an excess of carbon.   Some of the carbon falls out of solution as cementite (an iron/carbon compound having an orthorhombic crystal structure), leaving behind a surrounding phase of ferrite.   Together, ferrite and cementite produce a layered structure called pearlite.

20.     The grains in steel generally comprise ferrite and pearlite.   The size and distribution of these grains help determine the strength, integrity and quality of the steel.

21.     The microstructure of steel after forging is often non-uniform, having large grains and areas of segregation (bands) of the alloying elements.   This coarse grained and inhomogeneous

microstructure has a negative impact on the steel's mechanical properties as well as on its machinability.  Stated another way, such steels may be susceptible to fracture and failure.

22.     The properties of carbon steel can be tailored by manipulating the microstructure through deformation (e.g., rolling or forging) and heat treatment.  Heat treatment is the reheating and cooling of a steel object in order to alter its physical, and sometimes chemical, properties.  Forged parts made of carbon steel are often heat treated to eliminate variations in microstructure.

## C.     NORMALIZATION OF STEEL

23.     **Normalizing** is the most extensively used industrial heat treatment process.  It is a relatively simple but effective heat-treatment for obtaining a steel with a more fine-grained homogeneous microstructure and more predictable properties and machinability.  During normalization, carbon steel is uniformly **reheated** to a temperature above the upper transformation temperature, held at that temperature, and subsequently cooled in air at room temperature.

24.     The process of normalizing steel has distinct benefits.  Cycling the steel through the change from ferrite/pearlite to austenite and back to ferrite/pearlite causes complete recrystallization and replacement of the existing grain material.  The new grain structure will have smaller and more uniform grains which, in turn, can improve the machinability of low carbon steels; improve dimensional stability; reduce banding; and/or improve ductility and toughness.

25.     Normalizing steel requires equipment, suitable facilities, as well as significant additional energy, labor and time.  Because normalization is an additional process that consumes time and resources, performing normalization increases the manufacturer's cost to produce steel components, including flanges.

**D.      THE ASTM SPECIFICATIONS APPLICABLE TO CARBON STEEL FLANGES**

26.      The American Society of Testing and Materials (ASTM) has published standards and specifications applicable to carbon steel flanges.  The ASTM standards are widely accepted in the steelmaking industry, and relied upon by customers, including those purchasing flanges.  In particular, ASTM A105, "Standard Specification for Carbon Steel Forgings for Piping Components," prescribes the chemical and mechanical property requirements for forged carbon steel flanges, for use in pressure systems at ambient- and higher-temperature service conditions.

27.      ASTM A105 does not require that every carbon steel flange be heat treated, but it does require that certain types of flanges, including flanges above pressure class 300, must undergo heat treatment.  If heat treatment is specified or required, ASTM A105 states that it may be accomplished by several different methods in accordance with ASTM A961, "Specification for Common Requirements for Steel Flanges, Forged Fittings, Valves and Parts for Piping Applications."  The methods specified in ASTM A961 (which incorporates ASTM A941) include **normalization**.  Even though it is not required by ASTM A105, many customers, including those in the oil and gas industry, require that flanges in the 150 and 300 pressure classes be normalized.

**E.      BOLTEX'S AND WELDBEND'S COMPLIANCE WITH ASTM A105**

28.      Boltex and Weldbend manufacture, market and sell a variety of types and sizes of carbon steel flanges.  Among the flanges that Boltex and Weldbend manufacture, market and sell are carbon steel flanges that meet ASTM A105 and have been normalized in compliance with ASTM A105 and ASTM A961.  The Boltex and Weldbend flanges undergo a normalization process whereby unfinished flanges are carefully loaded onto pallets, the pallets are placed in a dedicated furnace to reheat the flanges to the required temperature, the flanges are maintained at this temperature for a time corresponding to the flange's size and thickness (the soaking period), and the pallets are removed from the furnace so that the flanges may cool in room temperature air.

This process is time, labor and capital intensive and, thus, expensive.  Boltex and Weldbend maintain careful records of this normalization process.

29.     Boltex and Weldbend sell their normalized flanges to customers that require that the steel has a refined grain structure and the physical characteristics of products that have undergone such heat treatment.

30.     Boltex and Weldbend stamp their normalized flanges with the ASTM "A105N" description:  per industry standards, the "N" stands for normalized.  Boltex and Weldbend also indicate that the flange has been normalized in the Mill Test Report (MTR) that accompanies each flange.  MTRs are used in the steelmaking industry to promote and certify a material's compliance with appropriate ASTM standards, applicable dimensions, physical and chemical specifications.  For example, a Boltex normalized flange, stamped with "SA105N"[2] is shown below:



31.     Because of the additional costs, Boltex and Weldbend charge their customers a premium for 150 and 300 class normalized flanges compared to similar flanges that Boltex and Weldbend manufacture, market and sell in an "as forged" (i.e. non-normalized) condition.

---

[2] ASTM and the American Society of Mechanical Engineers (ASME) cooperate with each other in the preparation of material specifications.  When the ASME uses ASTM specifications, it assigns the prefix "S" followed by the ASTM designation.  Thus, materials stamped as "SA105" are represented as complying with ASTM A105, and as suitable for applications governed by ASME specifications.

**F.    DEFENDANTS FALSELY AND MISLEADINGLY ADVERTISE THEIR CARBON STEEL FLANGES AS NORMALIZED AND COMPLYING WITH ASTM A105**

32.    Ulma is a Spanish manufacturer of carbon steel flanges located in northern Spain. Ulma makes flanges in a variety of materials, types and sizes.

33.    Based on Ulma's website and upon information and belief, Ulma USA acts as Ulma's North American representative and sales agent.

34.    Defendants market, promote, advertise, offer for sale, sell and/or distribute carbon steel flanges to customers located in Houston, throughout Texas, and elsewhere in the United States.   These include flanges that Defendants advertise and promote as normalized and as compliant with the requirements of ASTM A105.   Defendants advertise and promote the flanges as ASTM "A105N" indicating that the flanges (a) meet all the requirements of ASTM A105 and (b) are normalized.   Defendants' purported ASTM "A105N" compliant flanges are advertised, among other places, in catalogs Defendants distribute to their customers and potential customers and make publicly available via their website, www.ulmapiping.com:



Ulma Flange Technical Handbook at 128, available at http://www.ulmapiping.com/_docs/catalogs/ ULMATechnicalHandbook.pdf.

They are also described in the catalogs, brochures, price lists and websites of third-party distributors

of Ulma flanges.  *See* e.g., http://www.technotools.ae/Product_Services.aspx?type=All



35.    Defendants further promote their flanges as normalized and as compliant with the

requirements of ASTM A105 in the MTRs that accompany each flange.

Defendants further advertise and promote their flanges as normalized and complying with ASTM A105 by stamping "A105N" on the flanges themselves.



36.     Defendants sell their purportedly "normalized" flanges at a price that is less than the price at which Boltex and Weldbend sell their normalized flanges, and at about the same price at which Boltex and Weldbend sell their "as forged"  (non-normalized) flanges.

37.     Carbon steel flanges of the same type and class are fungible products.  Customers believe that flanges meet the requirements of the standards they are purported to meet and based on that belief generally select and purchase flanges based upon price alone.  End-users are less concerned about where a flange is manufactured provided that the flange meets the customer's specifications and any applicable standards including ASTM.

38.     Because of the difference in price, and a belief that Defendants' flanges are of the same quality and meet the same standards as Plaintiffs' flanges, customers that require normalized flanges compliant with ASTM A105 purchase Defendants' flanges instead of Plaintiffs' flanges. Customers that purchase Defendants' normalized flanges believe from Defendants' advertising and promotion that they are getting a bargain by purchasing what they believe is a premium "normalized" flange at no additional cost over the expense of a Boltex or Weldbend flange that has not been normalized.

### G.   DEFENDANTS' REPRESENTATIONS ABOUT THEIR FLANGES ARE FALSE AND MISLEADING

39.   Defendants' claim that their flanges are normalized is literally and/or impliedly false and misleading.  Defendants' flanges are not normalized.  Defendants do not subject their flanges to a separate heat treatment process whereby the flanges are uniformly reheated to a temperature above the upper transformation temperature, held at the temperature, and subsequently allowed to air cool.

40.   As shown in the image below on the left, examination of the microstructure of samples taken from Defendants' purportedly normalized flanges shows that the steel exhibits a coarse grain structure inconsistent with a material that has been normalized.  Additionally, after the same material is subjected to a normalization process, the grain size exhibited by Defendants' flanges is significantly refined—the grain size is up to 8 times smaller—consistent with normalized steel.





As received                                                 After normalization

41.     The grain structure of a steel component that has already been normalized exhibits only minimal, if any, change after a "**re-**normalization" process.  Thus, such a dramatic change in grain size would not occur if Defendants' flanges were normalized as Defendants claim.

42.     Defendants skipped the normalization step entirely or, alternatively, failed to uniformly reheat the flange above the upper transformation temperature.  Therefore, Defendants' advertising and promotion of their flanges as "normalized" are false.

43.     Upon information and belief, Ulma does not have sufficient furnace capacity to normalize all of the flanges it claims meet ASTM A105.

44.     Defendants' advertising and promotion of their flanges as "normalized" are also false and misleading because "normalization" necessarily implies to customers and end-users that the steel exhibits certain qualities including grain refinement and improved homogenization. Examination of the microstructure of Defendants' flanges show that these qualities are absent.

45.     ASTM A105 requires that flanges above Class 300 (i.e., Classes 400, 600, 900, 1500 and 2500) **must** undergo heat treatment, i.e., normalization.  Because Ulma does not normalize its flanges, Defendants' flanges that are above Class 300 do not comply with ASTM A105.  Accordingly, Defendants' claim that their Class 400, 600, 900, 1500 and 2500 flanges meet ASTM A105 is also false.

46.     Defendants' false and misleading representations are material.  "Normalized" flanges are more expensive than comparable flanges sold "as forged."  Thus, if a customer purchases a flange described as normalized, meeting ASTM A105, and/or as "A105N," it is because the customer's application requires a flange having those qualities.  If customers that purchased Defendants' purportedly "normalized" carbon steel flanges knew that the flanges were

not, in fact, normalized and/or Defendants did not comply with the heat treatment requirements of ASTM A105, these customers would not purchase Defendants' flanges.

47.     Defendants false and misleading advertisements have had their intended effect, and customers that would have purchased Plaintiffs' flanges have instead purchased Defendants' non-normalized flanges.  The actions of Defendants thus have caused and continue to cause Plaintiffs harm.  By avoiding the normalization step (and the associated expense), but nonetheless falsely and misleadingly describing their flanges as normalized, Defendants can sell their products at a lower price than can Plaintiffs.  Because Defendants' falsely advertised flanges are less costly than the equivalently described flanges sold by Boltex and Weldbend, customers in the State of Texas and across the country have purchased Defendants' flanges for use in their applications in lieu of those marketed by Boltex and Weldbend.

## COUNT I

### FALSE ADVERTISING IN VIOLATION OF
### THE LANHAM ACT, 15 U.S.C. § 1125(a)

48.     Plaintiffs refer to and incorporate the allegations of the preceding paragraphs as though fully set forth herein.

49.     Defendants advertise, promote, distribute, and sell purportedly normalized and ASTM A105-compliant flanges throughout the United States and Texas to distributors, customers and others, for use in the oil and gas, petrochemical, transmission, engineering, construction, and other industries.

50.     Defendants advertise, promote, distribute, and sell their purported "normalized" flanges by making false and misleading statements in advertising and promotions, including catalogs, price lists, websites, on the flanges themselves, and on the accompanying MTRs to create

the false impression that the Defendants' flanges are normalized and that they meet the specifications of ASTM A105.

51.     Defendants' promotional claims about their flanges are literally and/or impliedly false and misleading.  Defendants' flanges have not been normalized, they do not exhibit the characteristics of normalized flanges, and because Defendants' flanges above Class 300 have not been normalized, they do not meet the specifications of ASTM A105.

52.     Defendants' promotional claims violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides in relevant part that

> any person who, on or in connection with any goods or services, . . . uses in commerce any . . . false or misleading description of fact or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable to a civil action by any person who believes that he or she is likely to be damaged by such act.

53.     Additionally, Defendants are liable for false advertising under the Lanham Act because they intentionally induced and/or knew or had reason to know that distributors and other third parties who market and sell Defendants' flanges would falsely describe Defendants' flanges as "normalized" and compliant with ASTM A105, but continued to market and sell the products to those entities anyway.

54.     By reason of Defendants' conduct, Plaintiffs have suffered or are likely to suffer, damage to their business, reputations, and goodwill.  Pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to damages for Defendants' Lanham Act violations, an accounting of profits made by Defendants on sales of their so-called "normalized" flanges, and recovery of Plaintiffs' costs for this action.

55.     Defendants' acts are willful, wanton and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiffs to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

56.     Unless enjoined by this Court, Defendants' acts will irreparably injure Plaintiffs' goodwill and erode their market share.  Pursuant to 15 U.S.C. § 1116, Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent Defendants' continuing acts.

57.     Upon information and belief, Defendants will continue their violation of the Lanham Act unless this violation is restrained and enjoined by this Court.  Due to Defendants' continuing acts of false advertising, Plaintiffs have suffered and/or will suffer irreparable injury for which they have no adequate remedy at law.

## COUNT II

### UNFAIR COMPETITION IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(a)

58.     Plaintiffs refer to and incorporate the allegations of the preceding paragraphs as though fully set forth herein.

59.     Defendants have marketed and continue to market their carbon steel flanges as equivalent to but cheaper than the normalized, ASTM A105-compliant flanges manufactured, marketed and sold by Plaintiffs.  In doing so, Defendants have deceived, misled and confused distributors, customers and others.

60.     Defendants' false and misleading description of their flanges as meeting the same standards and having the same characteristics as Plaintiffs' flanges is likely to cause and has caused confusion, mistake or deception about the nature, characteristics, and qualities of Defendants' flanges in comparison with Plaintiffs' flanges.

61.     Defendants know, or in the exercise of reasonable discretion should know, that their advertising deceives distributors, customers and others about the nature, characteristics and qualities of Defendants' carbon steel flanges in comparison with equivalently described flanges advertised, marketed and sold by Plaintiffs.

62.     Defendants' conduct amounts to deception, trickery and/or unfair methods and has damaged and jeopardized Plaintiffs' business.  As a result of such malicious, wanton and/or fraudulent conduct, Defendants have caused, and unless enjoined by this Court, will continue to cause, consumer confusion as to the nature, characteristics and qualities of Defendants' carbon steel flanges in comparison with equivalently described flanges advertised, marketed and sold by Plaintiffs.

63.     Defendants' acts constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides in relevant part that

> Any person who, on or in connection with any goods or services … uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which … is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

64.     Additionally, Defendants are liable for unfair competition under the Lanham Act because they intentionally induced and/or knew or had reason to know that distributors and other third parties who market and sell Defendants' flanges would falsely describe Defendants' flanges as "normalized" and compliant with ASTM A105, but continued to market and sell the products to those entities anyway.

65.     By reason of Defendants' conduct, Plaintiffs have suffered or are likely to suffer, damage to their businesses, reputations and goodwill.  Pursuant to 15 U.S.C. § 1117, Plaintiffs are

entitled to damages for Defendants' Lanham Act violations, an accounting of profits made by Defendants on sales of the falsely advertised flanges, and recovery of Plaintiffs' costs for this action.

66.     Defendants' acts are willful, wanton and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiffs to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

67.     Unless enjoined by this Court, Defendants' acts will irreparably injure Plaintiffs' goodwill and erode their market share.  Pursuant to 15 U.S.C. § 1116, Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent Defendants' continuing acts.

## COUNT III

## COMMON LAW UNFAIR COMPETITION

68.     Plaintiffs refer to and incorporate herein the allegations of the preceding paragraphs as though fully set forth herein.

69.     Defendants have made false and misleading explicit and implicit representations of fact to distributors, customers and others that their carbon steel flanges are normalized and that they meet the specifications of ASTM A105, but they are nonetheless cheaper than equivalently described flanges marketed and sold by Plaintiffs.  In making these representations, Defendants have deceived, misled and confused distributors, customers, end-users and others.  Defendants' false and misleading descriptions of their carbon steel flanges as "normalized" and compliant with ASTM A105 are likely to cause confusion, mistake or deception about the nature, characteristics and qualities of their flanges in comparison with the Plaintiffs' carbon steel flanges.

70.     Defendants know or in the exercise of reasonable discretion should know, that their advertising encourages the sale and use of their carbon steel flanges in place of Plaintiffs'

equivalently described flanges, and the deception of distributors, customers, end-users and others, about the nature, characteristics and qualities of Defendants' flanges in comparison with Plaintiffs' flanges.

71.     Defendants' actions are willful and have been undertaken with the purpose of deceiving customers.

72.     As a result of such conduct, Defendants have caused, and unless enjoined by this Court, will continue to cause, consumer confusion as to the nature, characteristics and qualities of their carbon steel flanges in comparison to Plaintiffs' equivalently described flanges, and damage to Plaintiffs' businesses, reputations and goodwill for which they are entitled to relief.

73.     Plaintiffs are entitled to damages for Defendants' unfair competition, an accounting of profits made on sales of Defendants' falsely described flanges, and recovery of Plaintiffs' costs of this action.

74.     In addition, Defendants knew or should have known that their conduct was reasonably likely to result in injury, damage or other harm, thus warranting the award of punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that all issues be determined by jury.

## PRAYER FOR RELIEF

Plaintiffs pray for the following relief:

A.     A judgment and order preliminarily and permanently enjoining Defendants, their agents, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with them, from directly or indirectly falsely advertising or promoting their carbon steel flanges, alone or in comparison to Plaintiffs' flanges;

B.      A judgment and order preliminarily and permanently enjoining Defendants, their agents, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with them, from making or inducing others to make any false, misleading or deceptive statement of fact or representation of fact in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of Defendants' carbon steel flanges in such fashion as to suggest that Defendants' flanges are normalized, that Defendants' carbon steel flanges above Class 300 are ASTM A105 compliant, or that Defendants' flanges are equivalent to, but cheaper than, Plaintiffs' flanges.  This injunction would include but not be limited to removal of all ASTM "A105N" descriptions and marks in Defendants' advertising and promotion;

C.      A judgment and order requiring that Defendants take corrective action to correct any erroneous impression persons may have derived concerning the nature, characteristics, or qualities of Defendants' carbon steel flanges, including without limitation the placement of corrective advertising;

D.      A judgment and order granting Plaintiffs such other relief as the Court may deem appropriate to prevent the trade and public from deriving any erroneous impression concerning the nature, characteristics or qualities of Defendants' carbon steel flanges;

E.      A judgment and order requiring Defendants to pay Plaintiffs damages in the amount of Plaintiffs' actual and consequential damages resulting from Defendants' false and misleading advertising, and unfair competition pursuant to 15 U.S.C. § 1117(a), and the common law of the State of Texas;

F.     A judgment and order finding that this is an exceptional case and requiring Defendants to pay Plaintiffs additional damages equal to three times the actual damages awarded Plaintiffs pursuant to 15 U.S.C. § 1117(a);

G.     A judgment and order requiring Defendants to pay the costs of this action under 15 U.S.C. § 1117(a);

H.     An order finding that Defendants acted maliciously, wantonly and/or fraudulently, requiring Defendants to pay Plaintiffs punitive damages pursuant to the common law of the State of Texas;

I.     An accounting be directed to determine Defendants' profits resulting from their illegal activities and such profits be paid over to Plaintiffs, increased as the Court finds to be just under the circumstances of this case pursuant to 15 U.S.C. § 1117(a);

J.     A judgment and order requiring Defendants to pay Plaintiffs pre-judgment and post-judgment interest on the damages awarded; and

K.     Such other and further relief as the Court deems just and equitable.

Dated: May 5, 2017                              Respectfully submitted,

                                                *s/Saul Perloff*
                                                _____

                                                **Saul Perloff**
                                                **Attorney-In-Charge**
                                                Texas Bar No. 00795128
                                                saul.perloff@nortonrosefulbright.com

                                                **Katharyn Grant**
                                                Texas Bar No. 24050683
                                                katharyn.grant@nortonrosefulbright.com

                                                **NORTON ROSE FULBRIGHT US LLP**
                                                300 Convent Street, Suite 2100
                                                San Antonio, Texas 78205
                                                T +1 210 224 5575
                                                F +1 210 270 7205

                                                **ATTORNEYS FOR PLAINTIFFS**
                                                **BOLTEX MANUFACTURING COMPANY,**
                                                **L.P. and WELDBEND CORPORATION**