Case No. 4:17-cv-01400
Jury

United States District Court
For the Southern District of Texas
Houston Division

**Boltex Manufacturing Company, L.P. and Weldbend Corporation**
*Plaintiffs/Counter-Defendants*

**v.**

**Ulma Piping USA Corp. and Ulma Forja, S.Coop a/k/a Ulma Piping**
*Defendants/Counter-Plaintiffs*

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE
EXPERT REPORT AND TESTIMONY OF THOMAS W. BRITVEN AND
INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF**

<span style="color:red">**REDACTED VERSION**</span>

**NORTON ROSE FULBRIGHT US LLP**

**Saul H. Perloff**
Texas Bar No. 00795128
S.D. Texas Federal ID No. 20748
saul.perloff@nortonrosefulbright.com

**Katharyn A. Grant**
Texas Bar No. 24050683
S.D. Texas Federal ID No. 641461
katharyn.grant@nortonrosefulbright.com

300 Convent Street, Suite 2100
San Antonio, Texas 78205
(210) 224-5575

**NORTON ROSE FULBRIGHT US LLP**

**Marc B. Collier**
Texas Bar No. 08235900
S.D. Fed. Bar No. 24057
marc.collier@nortonrosefulbright.com

**Robert L. Rouder**
Texas Bar No. 24037400
S.D. Texas Federal ID No. 3108753
robert.rouder@nortonrosefulbright.com

98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701-4255
(512) 474-5201

**MAYER BROWN LLP**
**Carmine R. Zarlenga**
S.D. Texas Federal ID No. 3144210
czarlenga@mayerbrown.com

**Michael L. Lindinger**
S.D. Texas Federal ID No. 3144212
mlindinger@mayerbrown.com

1999 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3000

# TABLE OF CONTENTS

I.     NATURE AND STAGE OF PROCEEDING ................................................... 1

II.    ISSUE BEFORE THE COURT ..................................................................... 1

III.   STANDARD OF REVIEW .......................................................................... 2

IV.    SUMMARY OF ARGUMENT ...................................................................... 2

V.     ARGUMENT ................................................................................................ 4

       A.     Mr. Britven's Nov. 8, 2018 Report Does Not Contain Inadmissible
              Legal Conclusions ........................................................................... 4

              1.     Mr. Britven Gives No Opinion on the Applicable Law ............................ 4

              2.     Although Not Required, Mr. Britven Independently Verified
                     the Factual Predicate Underlying His Opinions .......................................... 6

       B.     Mr. Britven is Qualified to Opine on Plaintiffs' Lost Profits ................................ 8

       C.     Mr. Britven's Opinions on Lost Profits Apply the Correct Law and
              Appropriately Account for the Economics of the Market .................................... 12

              1.     As Defendants' Own Expert Admits, *Panduit* and *Mor-Flo* are
                     Applicable to Lost Profit Damages Calculations in Lanham Act Cases .. 12

              2.     *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.* is Inapt ..................... 13

              3.     Mr. Britven's Opinion is Not Unreliable Because He Disagrees
                     With Defendants' Contentions Concerning the Market ........................... 16

              4.     Mr. Britven's Opinion is Not Unreliable Because He Did Not
                     Credit Defendants' Speculation that Customers Might Have
                     Continued to Purchase Defendants' Falsely Advertised Flanges ............. 19

VI.    CONCLUSION ........................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*BASF Corp. v. Old World Trading Co. Inc.*,
    41 F.3d 1081 (7th Cir. 1994) ...................................................................................13

*Bazemore v. Friday*,
    478 U.S. 385 (1986)..............................................................................................11

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
    F.3d 1214 (Fed. Cir. 1993) .............................................4, 5, 6, 11, 14, 15, 16

*Bigelow v. N.Y. Lighter Co., Inc.*,
    No. A-03-CA-340 LY, 2005 WL 6742497 (W.D. Tex. June 27, 2005)...................10

*Boston Sci. Corp. v. Cordis Corp.*,
    838 F. Supp. 2d 259 (D. Del. 2012), *aff'd*, 497 Fed. Appx. 69 (Fed. Cir. 2013)....................15

*Brennan's Inc. v. Dickie Brennan & Co. Inc.*,
    376 F.3d 356 (5th Cir. 2004) .................................................................................13

*Brumley v. Pfizer, Inc.*,
    200 F.R.D. 596 (S.D. Tex. 2001)...............................................................................2

*Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics GmbH*,
    14-CV-585 (AJN), 2018 WL 4253181 (S.D.N.Y. Sept. 5, 2018) ....................13, 20

*Clark v. Takata Corp.*,
    192 F.3d 750 (7th Cir. 1999) .................................................................................11

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)...................................................................................1, 2, 19

*Erfindergemeinschaft UroPep Gbr v. Eli Lilly and Co.*,
    No. 2:15-CV-1202-WCB, 2017 WL 1050120 (E.D. Tex. Mar. 17, 2017).............10

*Ericsson, Inc. v. Harris Corp.*,
    352 F.3d 1369 (Fed. Cir. 2003)..............................................................................15

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
    830 F.2d 716 (7th Cir. 1987) .................................................................................13

*Gil Ramirez Grp., LLC v. Houston Indep. School Dist.*,
    No. 4:10-CV-04872, 2016 WL 4775688 (S.D. Tex. Sep. 13, 2016) ......................12

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)................................................................................................2

*Lapsley v. Xtek, Inc.*,
    689 F.3d 802 (7th Cir. 2012) ..................................................................................2

*MGM Well Servs., Inc. v. Mega Lift Sys., LLC*,
   505 F. Supp. 2d 359 (S.D. Tex. 2007), *aff'd*, 264 Fed. Appx. 900 (Fed. Cir.
   2008) .................................................................................................................3

*Milward v. Acuity Specialty Prod. Grp., Inc.*,
   639 F.3d 11 (1st Cir. 2011).................................................................................12

*Orthoflex, Inc. v. ThermoTek, Inc.*,
   986 F. Supp. 2d 776 (N.D. Tex. 2013) ...........................................................9, 18

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) .................................................................3, 6, 12, 14

*Petroleum Helicopters, Inc. v. Apical Indus., Inc.*,
   No. 6:13-CV-00015, 2017 WL 4127733 (W.D. La. Sept. 15, 2017) ....................18

*Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*,
   No. 2:15-CV-512-WCB, No. 2:16-CV-198-WCB, 2017 WL 1319553 (E.D.
   Tex. Apr. 10, 2017)..............................................................................................7

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
   883 F.2d 1573 (Fed. Cir. 1989*)*..............................................................3, 6, 12

*Stollings v. Ryobi Techs., Inc.*,
   725 F.3d 753 (7th Cir. 2013) ...............................................................................2

*Terrell v. Household Goods Carriers' Bureau*,
   494 F.2d 16 (5th Cir. 1974) ............................................................................9, 18

*United States v. Hicks*,
   389 F.3d 514 (5th Cir. 2004) ...............................................................................9

*United States v. Wen Chyu Liu*,
   716 F.3d 159 (5th Cir. 2013) ...............................................................................9

*Wheeler v. John Deere Co.*,
   935 F.2d 1090 (10th Cir. 1991) ...........................................................................9

*Zuzln Wind Energy Corp. v. Shippers Stevedoring Co.*,
   662 F. Supp.2d 623 (S.D. Tex. 2009) ..................................................................8

**Rules and Statutes**

Fed. R. Evid. 702...............................................................................................2

Lanham Act § 43(a) ..........................................................................1, 6, 8, 13, 14

Plaintiffs Boltex Manufacturing Company, L.P. ("Boltex") and Weldbend Corporation ("Weldbend") (together, "Plaintiffs") provide this response in opposition to Defendants Ulma Forja, S. Coop. a/k/a Ulma Piping and Ulma Piping USA Corp.'s (together, "Defendants" or "Ulma") motion to exclude the expert report and testimony of Thomas W. Britven. (Doc. 95).

## I.   NATURE AND STAGE OF PROCEEDING

Plaintiffs filed this action on May 5, 2017 under § 43(a) of the Lanham Act and common law, seeking damages arising from, and injunctive relief to stop, Defendant Ulma USA and its European parent Ulma Forja's false advertising and unfair competition. Complaint (Doc. 1). The Complaint alleges that Defendants falsely advertise and promote their carbon steel flanges, including advertising them as "normalized"—that is, as having undergone an additional heat treatment process that refined and homogenized the crystalline structure of the steel and improved its mechanical properties. *Id.* ¶ 1. As a result of Defendants' false advertising and unfair competition, Defendants sold carbon steel flanges that otherwise would have been sold by Plaintiffs. *Id.* ¶ 47. Defendants answered on August 31, 2018, asserting counterclaims against each Plaintiff, alleging they misuse phrases such as "Made in USA." Doc. 68. After the Court granted in part Plaintiffs' motion to strike certain paragraphs of Defendants' counterclaim, Doc. 84 (Order, adopting Report & Recommendation), Plaintiffs answered. Doc. 86 (Jan. 2, 2019).

Discovery has now completed, and currently pending before the Court are all parties' motions for summary judgment, as well as *Daubert/Kumho* motions.

## II.   ISSUE BEFORE THE COURT

Whether the expert report and testimony of Plaintiffs' expert, Thomas W. Britven, are admissible under *Daubert* and the Federal Rules governing the admissibility of expert opinions and testimony.

### III.    STANDARD OF REVIEW

This Court enjoys "significant discretion" in admitting expert testimony. *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 601 (S.D. Tex. 2001) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Testimony from a qualified expert is admissible to "assist the trier of fact to understand the evidence or to determine a fact in issue" if:

(1)    the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue,
(2)    the testimony is based upon sufficient facts or data,
(3)    the testimony is the product of reliable principles and methods, and
(4)    the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc*., 689 F.3d 802, 805 (7th Cir. 2012); *see also Stollings v. Ryobi Techs., Inc*., 725 F.3d 753, 765 (7th Cir. 2013) ("the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony"). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596).

### IV.    SUMMARY OF ARGUMENT

For the reasons set out more fully below, this Court should deny Defendants' motion to exclude Thomas Britven's testimony, opinions, and expert report.[1]

---

[1] While Defendants claim to seek to exclude all of Mr. Britven's testimony and opinions, their motion does not challenge Mr. Britven's calculations concerning Defendants' profits, or his opinions concerning Defendants' alleged Counterclaim damages. Because Defendants failed to challenge Mr. Britven's opinions on these issues, there is no reason to exclude or limit his testimony on any of these topics.

First, Mr. Britven's opinions and testimony concerning the share of Defendants' sales that Plaintiffs would have captured but for Defendants' false advertising is not a legal conclusion. That other courts have accepted a market share analysis as a valid framework for calculating lost profits does not make Mr. Britven's opinion "a legal opinion." In fact, this Court has joined many other courts and previously found Mr. Britven's lost profits analysis "well-reasoned and persuasive," and his "methodology for calculating lost profits to be accurate and appropriate." *MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, 505 F. Supp. 2d 359, 376-77 (S.D. Tex. 2007), *aff'd*, 264 Fed. Appx. 900 (Fed. Cir. 2008). Moreover, Defendants' argument that Mr. Britven's opinion should be excluded because he did not independently verify the truth of Plaintiffs factual allegations is both legally and factually mistaken.

Second, Mr. Britven is a nationally recognized expert in the areas of economic damages and remedies, including lost profits and disgorgement, and he is more than qualified to provide his opinions concerning Plaintiffs' lost profits in this case. The fact that Mr. Britven—a certified public accountant—does not have a degree in economics does not mean he is unqualified to give a damages opinion based on a market share analysis. The consideration Mr. Britven did or did not give to factors Defendants deem important bears not on his qualifications to give testimony, but goes only to the weight thereof.

Defendants' further contention that the market share analysis endorsed by *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978) and *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573 (Fed. Cir. 1989*)* are inapplicable to false advertising cases is demonstrably wrong, as is their contention that the flanges marketed by Plaintiffs and Defendants do not compete in the "same market segment." For this reason, Defendants' argument that the holding of *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc*., 1 F.3d 1214 (Fed. Cir. 1993) precludes application of market share analysis is also incorrect.

- 3 -

Finally, Defendants' arguments that Mr. Britven did not give proper consideration to independent factors such as pricing, presence on approved manufacturers' lists, and differences between "foreign" and "domestic" flanges ignore Mr. Britven's explanation that such factors are integral ("baked in") to the parties' market share. Arguments concerning whether Mr. Britven should have given individual consideration to each of these factors goes only to the weight of his testimony and not its admissibility. Defendants' further argument that their customers might have continued to purchase Defendants' Class 150 and 300 flanges even if they had known about Defendants' false advertising is rank speculation. No evidence supports this argument, and Mr. Britven was not required to credit Defendants' conjecture in his damages model.

In sum, Mr. Britven's market share approach to calculating Plaintiffs' lost profits is widely-accepted, and was reliably and properly applied to the facts of this case. His opinions and testimony will greatly assist the trier of fact in this matter. Any criticisms of Mr. Britven's opinions would go solely to the weight, not to the admissibility of his testimony.

## V.    ARGUMENT

### A.    Mr. Britven's Nov. 8, 2018 Report Does Not Contain Inadmissible Legal Conclusions

#### 1.    Mr. Britven Gives No Opinion on the Applicable Law

In his opening expert report, Mr. Britven opines that from May 5, 2013 through July 31, 2018, ███████████████████████████████████████

███████████████████████████████████████

███████████████ Britven Nov. 8, 2018 Report at 5 (Pls.' Ex. 7, Doc. 104-6). To derive these estimates, Mr. Britven employed a "market share approach." *Id.* at 19-40. Recognizing that the market for carbon steel flanges is supplied by several manufacturers, and not just the parties to this lawsuit, Mr. Britven determined the value of the total market for ASTM A105 carbon steel

flanges in the United States, and the market share currently held by each of the individual parties using their own sales data.



Britven Nov. 8, 2018 Report at 26 (Pls.' Ex. 7, Doc. 104-6).

He then distributed Defendants' sales proportionally across the remaining manufacturers in the market based on their existing market shares. Britven Nov. 8, 2018 Report at 25-26 (Pls.' Ex. 7, Doc. 104-6). After confirming that Plaintiffs possessed the capacity to manufacture these additional flanges, he multiplied the additional sales Plaintiffs would have captured by each company's incremental margin to calculate each Plaintiffs' lost profits. *Id.* at 39.



Britven Nov. 8, 2018 Report at 26 (Pls.' Ex. 7, Doc. 104-6).

The fact that Mr. Britven's approach to determining Plaintiffs' lost profits has been cited with approval by *Panduit* and *Mor-Flo Indus.* does not convert his opinion that a market share analysis is an appropriate way to calculate lost profits in this false advertising case into an impermissible "legal opinion." Adopting Defendants' argument would lead to the absurd result that a damages expert could never use a damages model that had been cited with approval by another court. As Mr. Britven states in his report there is "no 'cookbook' approach to determining lost profits." Britven Nov. 8, 2018 Report at 19. Consequently, Mr. Britven clearly explains the rationale behind his use of the market share methodology, shows that it is consistent with industry standards for analyzing lost profits in a market that contains more than two actors, and notes that the same approach has been used in other Lanham Act cases. *Id.* at 16.

### 2. Although Not Required, Mr. Britven Independently Verified the Factual Predicate Underlying His Opinions

Mr. Britven is a damages expert; he is not being offered as a witness on liability—a point he made clear several times during his deposition. *See* Britven Dep. 51:12-15 ("I have damage opinions"); *id*. 152:9-20 ("I've assumed it was not normalized and I've assumed false advertising."); *see also id*. 243:3-8; 330:18-21 (same).[2] As a general rule, a damages expert is allowed to assume liability, and need not perform his or her own causation analysis to offer useful expert testimony about the extent of damages. *Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, No. 2:16-CV-198-WCB, 2017 WL 1319553, at *5 (E.D. Tex. Apr. 10, 2017) (explaining "[t]his principle has been expressed in numerous cases, and it is beyond serious challenge," and summarizing cases).

However, even if he were required to do so, Defendants' contention that Mr. Britven's opinion should be excluded because he did not independently verify the truth of Plaintiffs

---

[2] Exhibit 5 to the Declaration of Katharyn Grant ("Grant Decl."), contemporaneously filed herewith. All exhibits cited herein are attached to Dr. Grant's declaration.

allegations and theories, and instead "impermissibly parrots plaintiffs' factual allegations" is demonstrably false. Doc. 95 at 7. As demonstrated by the extensive list of references cited in Mr. Britven's report and his deposition testimony, his opinions have a substantial factual predicate. The materials Mr. Britven considered include numerous interviews with employees of both Plaintiffs, deposition transcripts, discovery responses, and more than 100 documents produced by the parties in this lawsuit. *See, e.g.*, Britven Nov. 8, 2018 Report at 4-5 and Att. 2.0 (Pls.' Ex. 7, Doc. 104-6); Britven Dec. 4, 2018 Report at 3-4 and Att. 2.0 (Pls.' Ex. 8, Doc. 104-7); Britven Dep. 65:24-66:20; 67:11-13; 75:19-76:20 (Grant Decl. Ex. 5). He reviewed materials that show Boltex and Weldbend compete directly with Defendants in the market for carbon steel flanges, and that carbon steel flanges of the same specifications and class are fungible products. *See* Britven Nov. 8, 2018 Report at 27-32. He also verified, "Plaintiffs' allegations and theories about . . . Ulma's representations in the marketplace," Doc. 95 at 7, by reviewing correspondence between Defendants and their customers, Defendants' Material Test Reports (MTRs) and invoices, which include Defendants' representations that their A105 flanges are normalized. *See* Britven Nov. 8, 2018 Report at 29. Mr. Britven also confirmed Plaintiffs' manufacturing and marketing capacities through interviews with Plaintiffs' employees, and site visits to both Plaintiffs' production facilities. *See* Britven Nov. 8, 2018 Report at 4; Britven Dep. 264:20-265:10; 270:11-274:24. In short, Mr. Britven did far more than "parrot" Plaintiffs' allegations and theories. Additional questions about the factual predicate of Mr. Britven's opinions can be addressed during cross-examination at trial. *Suzlon Wind Energy Corp. v. Shippers Stevedoring Co*., 662 F. Supp. 2d 623, 667 (S.D. Tex. 2009) (argument that expert "did not review sufficient facts and data goes to the weight of his opinion, to be brought out in cross-examination and resolved by the jury, not to admissibility.") (collecting cases).

**B.      Mr. Britven is Qualified to Opine on Plaintiffs' Lost Profits**

Defendants' next contention, that Mr. Britven's alleged "lack of economic training disqualifies him from opining on complex markets like the one for flanges," Doc. 95 at 2, is also wrong. Mr. Britven is a nationally recognized expert in the areas of damages, lost profits, and disgorgement, as well as a well-recognized consultant and business advisor. *See generally* Britven Nov. 8, 2018 Report, Att. 1.0. He is a Certified Public Accountant and Certified Valuation Analyst, with in an accreditation in business valuation. *Id*. He has been involved in over 200 legal matters and has been accepted by courts as an expert over 50 times. Mr. Britven is also consistently named as one of the top 20 highly recommended economic experts in the IAM Patent 1000, which among other things, touts his expertise in determining lost profit damages.[3] In his work, he "regularly" deals with quantification of customers' comparative preferences for products, including how customers' preferences impact sales. Britven Dep. 33:2-19; 37:2-42:6 (Grant Decl. Ex. 5). Similarly, he has provided consulting services and expert testimony in numerous Lanham Act cases in the past, including false advertising cases. *See Id.; see also id*. 26:12-15; 27:13-22. He has also presented on the use of surveys in litigation, as well as economic damages and the "entire market value rule." *See generally* Britven Nov. 8, 2018 Report, Att. 1.0 (Pls.' Ex. 7, Doc. 104-6).

The fact that Mr. Britven's has a degree in accounting and not in economics does not render him "unqualified" to opine concerning the relative share of the market for A105 carbon steel flanges held by each of the parties. "'[A]n expert witness is not strictly confined to his area of practice, but may testify concerning related applications[.]'" *United States v. Wen Chyu Liu*, 716 F.3d 159, 168–69 (5th Cir. 2013) (quoting *Wheeler v. John Deere Co*., 935 F.2d 1090, 1100 (10th Cir. 1991)); *see also United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (To qualify as an expert, one only needs such knowledge or experience in his field or calling "as to make it appear

---

[3] *See* Grant Decl. Ex. 43, also publicly available at:
        https://www.iam-media.com/directories/patent1000/individuals/thomas-britven.

that his opinion or inference will probably aid the trier in his search for truth.") (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)). Mr. Britven's background, expertise, and specialized knowledge in accounting and ***decades*** of calculating economic damages undoubtedly meet these standards of admissibility and qualifies him to testify on damages in this lawsuit. *See Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 23–25 (5th Cir. 1974) (affirming decision to admit testimony from certified public accountant who had prepared net profit analysis and noting that party objecting to expert testimony had opportunity on cross-examination to challenge the bases for expert's opinion regarding lost sales); *Orthoflex, Inc. v. ThermoTek, Inc.,* 986 F. Supp. 2d 776, 790-94 (N.D. Tex. 2013) (certified public accountant's expert testimony regarding manufacturer's lost profits and lost sales was reliable and admissible). Moreover, Mr. Britven ***does*** have training in economics, including classes he took as an undergraduate, Britven Dep. 10:25-11:10; 28:21-24, and later as part of a three year executive program at Harvard Business School. *Id*. 12:16-25; 29:9-10; 30:9-16. He also testified that he "constantly" takes continuing professional education courses in accounting, cost accounting, and business valuation to maintain his numerous credentials. *See id.* 11:5-6, 11:18-12:8. And not only does Mr. Britven have a great deal of training and experience in "complex markets" generally, but his experience is particularly relevant to this matter, as it includes work involving "foundries, manufacturing, pipelines, and carbon steel flanges." Britven Nov. 8, 2018 Report at 3 (Pls.' Ex. 7, Doc. 104-6); Britven Dep. 18:24-19:7, 265:3-10 (Grant Decl. Ex. 5).

Defendants further suggestion that Mr. Britven is somehow "unqualified" to opine in this matter because he used the International Trade Commission's (ITC) June 2017 report on "Finished Carbon Steel Flanges From Spain," WEL-UL-004759 (Britven Dep. Ex. 3) (Grant Decl. Ex. 34), to help define the relevant market for his analysis, Doc. 95 at 10, makes no sense. The ITC Report was prepared over the course of months by an independent governmental agency, comprised of a

highly-credible multidisciplinary team, including an investigator, industry analyst, economist, accountant, statistician, and attorney. *See* WEL-UL-004759 at 4760 (Grant Decl. Ex. 34). Boltex, Weldbend and Ulma Forja were part of this ITC proceeding. *See, e.g., id*. at 4767, 4793, 4798. The report provided the information Mr. Britven required for his analysis, including the size of the U.S. market for ASTM A105 flanges during the relevant time frame. Defendants identify no reason why the ITC Report is unreliable, or an inadequate basis for Mr. Britven's opinions; in fact, Defendants' own damages expert, Dr. Thomas Varner, also relied on this same report. Varner Dep. 62:5-17 (Grant Decl. Ex. 18) ("I used the market data that Mr. Britven used as well"); *id.* at 82:9-20 (no disagreement with "the ITC's definition of the participants in the market or the market share that those participants hold."). As other courts have acknowledged, "[e]xperts are permitted to, and often do, rely on others' testing to support their opinions." *Erfindergemeinschaft UroPep Gbr v. Eli Lilly and Co.*, No. 2:15-CV-1202-WCB, 2017 WL 1050120, at *8 (E.D. Tex. Mar. 17, 2017); *see also Bigelow v. N.Y. Lighter Co., Inc.*, No. A-03-CA-340 LY, 2005 WL 6742497, at *2 (W.D. Tex. June 27, 2005) (review of experimental, statistical, or other scientific data generated by others in the field may suffice as a reasonable basis for an expert opinion) (citing *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999)).

Likewise, Defendants' argument that Mr. Britven is not qualified to offer an opinion on Plaintiffs' lost profits because he did not consider pricing differentials between the subject flanges is incorrect on several levels. As Mr. Britven testified, he did consider price. Britven Dep. 89:12-91:4 (Grant Decl. Ex. 5) ("I looked at the price"); *id*. 93:12-21; 94:5-95:4; 158:25-159:6; 215:2-22; 216:6-218:7, and in fact, Mr. Britven's market share approach accounts for differences in pricing. Moreover, any criticism of Mr. Britven's decision not to give more consideration to the alleged "impact of price differences on the relevant market" affects the probative value of the

methodology, not its admissibility. *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.")

Similarly, Defendants' contention that Mr. Britven is not qualified to offer the opinion that "[t]he record indicates that Ulma USA and Ulma Forja both compete directly with Plaintiff, and that both Defendants have sold finished A105 flanges in the U.S. to customers of Boltex and Weldbend," Britven Nov. 18, 2018 Report at 30, is equally nonsensical. Mr. Britven clearly identifies the facts on which he bases this opinion. *See, e.g., id.* at 30-33. Moreover, in other contexts, Defendants agree that Plaintiffs and Defendants directly compete, *see e.g.*, Doc. 68:

- "[s]ome of [Plaintiffs'] ASTM 105 carbon steel flanges and their high yield carbon steel flanges . . . ***compete directly with [Defendants'] offerings in the carbon steel industry***," *Id.* at ¶ 9 (emphasis added).

- [Plaintiffs] offer competitive ***products*** through ***the same channels of trade*** and ***directed to the same customers and/or prospective customers*** as [Defendants]," *id.* at ¶ 40 (emphasis added).

- "customers are likely to choose to purchase [Plaintiffs'] products ***instead of*** [Defendants'] products." *Id.* (emphasis added).

- Plaintiffs' alleged conduct "encourages the sale and use of their carbon steel flanges ***in place of*** [Defendants' flanges]." *Id.* at ¶ 69 (emphasis added).

In fact, Defendants' own expert admits this competition exists. Varner Dep. 149:14-24 (Grant Decl. Ex. 18) ("A. My understanding is that domestic producers, among whom include Boltex and Weldbend, were affected by--by [Ulma's] sales."); *id.* at 153:13-154:3 (admitting competition and overlap of sales between Ulma, Boltex, and Weldbend); *id.* at 157:2-12 (if a customer that purchased from Defendants no longer did so, those customers might purchase from Boltex or Weldbend).

In any case, the soundness of the factual underpinnings of Mr. Britven's analysis and the correctness of his conclusions based on that analysis are ultimately matters to be determined by the trier of fact. *Gil Ramirez Grp., LLC v. Houston Indep. School Dist.*, No. 4:10-CV-04872, 2016 WL

4775688, at *3 (S.D. Tex. Sep. 13, 2016) (quoting *Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 22 (1st Cir. 2011)). They have nothing to do with Mr. Britven's qualifications as an expert, and they are not a matters for the Court to decide on a motion to exclude his testimony.

**C.    Mr. Britven's Opinions on Lost Profits Apply the Correct Law and Appropriately Account for the Economics of the Market**

    **1.    As Defendants' Own Expert Admits, *Panduit* and *Mor-Flo* are Applicable to Lost Profit Damages Calculations in Lanham Act Cases**

Defendants' contention that the market-share damages model approved in *Panduit* and *Mor-Flo* "appl[y] only to patent cases" and not to false advertising case, is untrue. Doc. 95 at 11. As discussed above, Defendants' **own expert** agrees with Mr. Britven's use of a market share analysis, and in fact, also applied both *Panduit* and *Mor-Flo* as part of his lost profits analysis and apportionment method. Varner Dep. 235:22-236:3 (Grant Decl. Ex. 18) ("Q. Both you and Mr. Britven applied a market share approach, sometimes known as the *Mor-Flo* approach; right? A. For the lost profits we start with *Panduit* and then use the *Mor-Flo* style apportionment.); *id.* 236:5-11 (no problems with Mr. Britven's use of the *Mor-Flo* apportionment method).

In fact, numerous authorities support the application of a market share approach—wherein a plaintiff can recover lost profits based on lost sales in proportion to its adjusted share of the marketplace—outside the patent context. These include cases brought under the Lanham Act. *See, e.g*, *Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 371-72, 376 (5th Cir. 2004) (affirming district court's judgment awarding $250,000 in damages in a Lanham Act trademark infringement case, resulting from expert's lost profits calculations based on plaintiff's "historical market share"); *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1094-95 (7th Cir. 1994) (crediting the district court's market share allocation approach in a false advertising case because it accounted for market factors including price); *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics GmbH*, 14-CV-585 (AJN), 2018 WL 4253181, at *11 (S.D.N.Y. Sept. 5,

2018) (In a false advertising case, agreeing that "the methodology Dr. Bell applies—first, including all [Defendant's] sales as related to the false advertising, then allocating those sales to [Plaintiff] per its market share allocation, and finally calculating profits based on the per-stick profit margin—*is a reasonable way to determine C&D's lost profits*.") (emphasis added); *see also* Richard G. Munzinger, *Damages in a Commercial Context*, State Bar of Texas 27th Annual Advanced Civil Trial Course at 72 ("A third method for determining lost profits, termed the 'market share' method, estimates the market share the plaintiff would have had absent the defendant's illegal conduct and compares it with the total profits the plaintiff would have realized if the estimated market share has been achieved.") (citing *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 830 F.2d 716, 726 (7th Cir. 1987) (an antitrust case)) (Grant Decl. Ex. 41); *see also* Tiffany A. Harrod and Helga Zauner, *Lost Profits in Commercial Litigation: Proving and Defending Damages, Leveraging Calculation Methodologies, Documentation and Expert Evidence* (Webinar, Jan. 30, 2018) at 34, 40, and 56 (noting that lost profit methods can include either loss of specific contracts, or losses based on market share) (Grant Decl. Ex. 42).[4]

### 2. *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.* is Inapt

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc*., 1 F.3d 1214, 1218 (Fed. Cir. 1993) does not support Defendants' argument that the market-share approach is inapplicable to Plaintiffs' damages analysis. Doc. 95 at 12 (citing)). In *BIC*, the Federal Circuit reversed an award of lost profits based on Windsurfing's market share, finding that Windsurfing did not show that BIC's customers would have purchased sailboards from Windsurfing. *Id*. at 1216. Specifically, the Court found that the district court erred in

---

[4] In contrast, Defendants solely rely on an unreported 2005 case from Kansas, Defs.' Mot. at 12 (citing *Pound v. Airosol* Co., Inc., CIV.A.02-2632-CM, 2005 WL 6429719, at *2-3 (D. Kan. Mar. 31, 2005)) in support of their argument that the *Panduit* framework does not apply in a Lanham Act case. What Defendants fail to mention, however, is that there, the court excluded the expert's testimony because, *inter alia*, she did not conduct any analysis of the relevant market and failed to consider the extreme price differential between the products at issue ($0.64 vs. $3.33 (retail) and $1.99 (wholesale). That is not the case here.

> Assuming that, without BIC in the market, its customers would have redistributed their purchases among all the remaining sailboards, including Windsurfing's One Design boards at a price $200 to $300 more than BIC's.

*Id.* at 1218 (further noting that BIC's customers demonstrated a preference for sailboards priced around $350, rather than Windsurfing's boards priced around $600). These facts don't apply here, where all of the parties' flanges purport to meet the identical ASTM standards, and are similarly priced. Britven Dep. 216:6-218:7 (Grant Decl. Ex. 5) (while pricing is not identical between competitors in the relevant marketplace, the pricing is "substantially similar"); Affidavit of Damon Lee ("Lee Aff.") (Feb. 1, 2019) (Grant Decl. Ex. 38) at ¶ 9 ("as the price difference between import and domestic prices has closed in recent months, Lee Supply has moved to stocking a majority of domestic flanges on its shelves.")  Numerous courts have found *BIC* inapplicable where the products at issue were sufficiently similar and the parties were competitors. For example, in *Corelogic Info. Solutions, Inc. v. Fiserv, Inc.*, the court distinguished *BIC Leisure*, finding

> [T]here is sufficient evidence to support Ratliff's opinion, and finds that these facts are distinguishable from the situation presented in *BIC Leisure Products*. In *BIC Leisure Product*s, the evidence showed that the infringer's sailboards and the patentee's sailboards ***were not direct competitors and not interchangeable***. The ***patentee's sailboards sold at prices 60-80% higher than the infringer's sailboards***, and the evidence showed that if the infringer's sailboards were no longer available, customers would switch to other non-infringing sailboards made by other manufacturers in the same price range as the infringing sailboards. Due to the elasticity of demand and the availability of acceptable non-infringing substitute products, the patentee was not able to establish but-for the infringement the patentee would have made those sales. The facts relied upon by Ratliff are quite different. First, Ratliff relies on CoreLogic's evidence that suggests there are no acceptable non-infringing substitute products. Second, Ratliff has pointed to evidence that CoreLogic's AVM output is interchangeable for Interthinx's AVM output. Accordingly, the Court overrules Interthinx's objection.

No. 2:10-CV-132-RSP, 2012 WL 12897920, at *2 (E.D. Tex. Sept. 22, 2012) (internal citations omitted) (emphasis added). Similarly, in *Cook Inc. v. Endologix, Inc*., the court found:

- 14 -

> Ms. Davis's methodology and report are reliable. First, the Court agrees with Cook that [*BIC* is] inapposite. The differences in products contemplated in *BIC* . . . were greater in degree than in the current case. For example, ***in BIC, the difference in price between the products essentially meant the two parties were not competitors for the same sales***. Here, the differences between the Powerlink and Cook's products do not rise to this extreme. Endologix and Cook still ***directly compete for sales***.

No. 1:09-CV-01248-TWP, 2012 WL 3948614, at *5 (S.D. Ind. Sept. 10, 2012). In *Cook*, the court further held that because there was competing evidence as to whether the products at issue were "distinct or fairly interchangeable," and to the extent "Endologix believes Ms. Davis's opinion did not adequately consider the different variables of the products," it was "ultimately 'up to the jury [ ] to weigh the credibility of the parties' opposing theories and evidence.'" *Id.* (citing *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1378 (Fed. Cir. 2003)); *see also Boston Sci. Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 274 (D. Del. 2012), *aff'd*, 497 Fed. Appx. 69 (Fed. Cir. 2013) (finding *BIC* inapplicable because "sufficient evidence supports the determination that a specific market existed for 2.25 mm DESs and, within this market, the demand for Taxus Atom and 2.25 mm Cypher DESs was interchangeable. * * * BSC was not 'obliged to negate every possibility that a purchaser might not have bought [the Cypher product] instead of the [Taxus Atom product], or might have foregone the purchase altogether.'")

Mr. Britven considered *BIC* and testified that its facts were very different than those presented by this case. *See generally* Britven Dep. 86:23-90:10 (Grant Decl. Ex. 5) ("I looked at the price. I looked at the market characteristics. I looked at the distribution channels. And I think this case is very different from the *BIC Leisure*.") As Mr. Britven noted, here

> we have the same distribution channel. We have the same product characteristics. And you can say, well, there are some minor differences. They are substantially the same. And with regards to price, in the *BIC Leisure* case the price difference was very large. I want to say 60 to 80 percent . . . That's not our circumstance here.

*Id.* at 90:12-91:4.

- 15 -

### 3. Mr. Britven's Opinion is Not Unreliable Because He Disagrees With Defendants' Contentions Concerning the Market

Defendants' also mistakenly contend that Mr. Britven's opinion should be excluded because he did not consider certain factors Defendants assert are important, i.e.,

- "distinctions between foreign and domestic manufacturers," including "availability, traceability and liability (as well as origin, price and AMLs)" in the flange market. Doc. 95 at 15-16.

- price data and price differences. Doc. 95 at. 16-18.

- manufacturers' presence or absence on approved manufacturers lists (AMLS). Doc. 95 at 18-19.

- the overlap in sales between Ulma and Plaintiffs." Doc. 95 at 19.

As Mr. Britven explained, he considered each of these factors. *E.g.*, Britven Dep. 89:12-91:4 (Grant Decl. Ex. 5) ("I looked at the price"); *id*. 104:25-105:-3 ("I considered AMLs in the but-for world to the extent they impact distribution channels"); *id*. 302:3-19 (discussing analysis of overlap in customers). However, to the extent these factors play a role in determining which manufacturer will make which sales, Mr. Britven explained that these factors are intrinsic to the parties' existing market share, e.g.,

> Well, we know -- we know by definition that there are AMLs out there, and then we know what the actual shares are. So whatever the influence from the AMLs are, it's all baked into the market share

*Id*. 127:10-14; *see also id*. 159:4-8 ("The pricing – I used dollar value market shares so the pricing is baked into the dollar value of the market share); *id*. 167:3-4 ("Your market share takes into account everything going on in the market.") In other words, by reallocating Defendants' sales to Plaintiffs in proportion to their current market share, Mr. Britven made the implicit assumption that approximately 80% of Defendants former customers would not purchase Plaintiffs' flanges, but would instead turn to another supplier. *Id*. 153:11-20 ("And so in this case, generally speaking 20 percent of the basket of sales that were made by Ulma would shift to Boltex and Weldbend, and 80 percent would not.") For this reason, Mr. Britven did not find it necessary to make specific

- 16 -

adjustments in his damages calculation for these factors. *Id*. 106:15-18 (with regard to AMLs, "[y]es it was considered. I didn't make a – specific adjustment, but that would be consistent with my understanding of the industry.")

Although Mr. Britven's damages model did not make specific adjustments to account for these factors, the evidence shows that if these factors were considered separately, any adjustments would actually weigh *in favor* of additional sales to Plaintiffs beyond those allocated by the market share model. *Id*. 157:11-13 ("I think my --I think my but-for market shares are understated in my lost profits analysis.") There is ample evidence that if Defendants' falsely advertised flanges were taken out of the market, many of the sales formerly made by Defendants would have been made by Plaintiffs. *See e.g.*, Man Dep. 162:15-163:3 (Grant Decl. Ex. 13) ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ );

Raban Dep. 66:7-16 (Grant Decl. Ex. 15) (Industrial Valco has purchased flanges from Boltex); id. at 77:5-15 (Industrial Valco would purchase from another foreign manufacturer only if price were the primary driver); Graff Dep. 266:15-267:25 (Grant Decl. Ex. 11) (██████████████████

████████████████████████████████ ); Smith Dep. 204:8-205:21 (Grant Decl. Ex. 16) (██████████████████████████████████████

████████████████████████████ ); Lee Aff. (Feb. 1, 2019) ¶ 9 (Grant Decl. Ex. 38).

> [C]ustomers buy imported flanges because they believe them to meet all specifications and be just as good [sic] domestic flanges, and historically there has been a price advantage. If there is no price advantage, they would not refuse to buy a Made in USA or domestic flange. In fact, as the difference between import and domestic prices has closed in recent months, Lee Supply has moved to stocking a majority of domestic flanges on its shelves. If an import or generic flange manufacturer could not supply a flange within specifications, we would absolutely consider supplying a Weldbend or Boltex flange to fill that order.

Ultimately, arguments concerning Mr. Britven's consideration of pricing, AMLs and other factors in his damages model goes to the weight of his testimony and not its admissibility. *Orthoflex*, 986 F. Supp. 2d at 792 (rejecting plaintiffs' argument that expert must be excluded because his damages calculations did not adequately account for other variables because such a challenge goes to the weight of the testimony, not its admissibility). Defendants may explore the basis and assumptions underlying Mr. Britven's calculations on cross-examination at trial. *Terrell,* 494 F.2d at 23-25; *Petroleum Helicopters, Inc. v. Apical Indus., Inc.,* No. 6:13-CV-00015, 2017 WL 4127733, at *3 (W.D. La. Sept. 15, 2017) ("The opposing party has the right to cross examine an expert and to explore the assumptions, facts, and methodology underlying the expert's opinion, and a jury is free to weigh an expert's credibility and to accept or reject an expert's opinion testimony.") But to the extent Defendants suggest that factors such as pricing, origin, appearance on AMLs, etc., override the importance of their flanges actually meeting the specifications they are described as meeting, the evidence shows they are simply wrong. The testimony of numerous third party distributors makes this point clear. *See* Man Dep. 69:11-70:2 (Grant Decl. Ex. 13) (████████ ████████████████████████████████████████████████████████████████████; Lee Aff. (Feb. 1, 2019) at ¶ 6 (Grant Decl. Ex. 38) ("We would not accept being sold a flange that was otherwise fine, but had not been normalized, when normalization was part of the specifications."); *id.* at ¶ 8 ("[M]y customers are shopping on price because they believe all the A105 flanges available meet specifications. If – for whatever reason – imported flanges did not meet specifications (including A105), customers would not knowingly purchase [the flanges]."); Smith Dep. 44:16-19 (Grant Decl. Ex. 16) (████████████████████████████████████████ ██████████████████████████████████████████"); *id.* 71:5-7 (████████████████████ ██████████████████████████████).

### 4.    Mr. Britven's Opinion is Not Unreliable Because He Did Not Credit Defendants' Speculation that Customers Might Have Continued to Purchase Defendants' Falsely Advertised Flanges

Finally, Defendants contention that Mr. Britven's damages opinion should be excluded because he did not consider (1) "that Plaintiffs do not currently normalize flanges at the 150 and 300 pressure classes," and (2) "whether any customers would have continued purchasing [such flanges] from Ulma", Doc. 95 at 19-20, is wrong. Mr. Britven was not required to give credence to Defendants' unsupported theory that customers would have purchased Defendants' Class 150 and 300 flanges even if they knew they were falsely advertised. Any contention that he should have is, at most, a matter for cross-examination at trial. *Daubert*, 509 U.S. at 595-96.

Although ASTM Standard A105, "Standard Specification for Carbon Steel Forgings for Piping Applications," requires heat treatment only for certain classes of flanges, i.e., class 400 and up, there is no dispute that ███████████████████████████████████████ ██████████." Bastida Dep. 85:22-86:1 (Grant Decl. Ex. 2) ("██████████████████████ ███████████████████████) There is also no dispute that despite their flanges' description and markings, ████████████████████████████████████████████████ ████████████ Errasti Dep. 105:25-107:5 (Grant Decl. Ex. 9) ("█████████████████████ ████████████████████████████████████████████████████████████ ████████████ id. 108:17-21 ████████████████████████████████████ ██████████████████████████████████████████████████████████ Hence, whether ASTM A105 required Defendants to normalize its class 150 and class 300 flanges is immaterial; *all* of Defendants' A105 flanges were falsely advertised.

Defendants' argument that their customers "would continue to purchase ASTM 150 and 300 class flanges from Ulma and not Plaintiffs," Doc. 95 at 20, presumably even if those customers ████████████████████████████████████████████, is nothing more than rank speculation.

In fact, the evidence in this case points to a contrary conclusion. *See e.g.,* Graff Dep. 228:21-229:10 (Grant Decl. Ex. 11) ███████████████████████████████████████

████████████████████████████████████████████; *see also* Raban Dep. 62:4-7 (Grant Decl. Ex. 15) ███████████████████████████████████████████

██████████████████████████████████████████ Bastida Dep. 43:12-18 ████████████████████████████████████████████████

███████████████

As other courts have explained, Plaintiffs need only "present[] a reasonable calculation of damages in this fundamentally equitable proceeding." *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics GmbH*, No. 14-cv-585, 2018 WL 4253181, at *3 (S.D.N.Y. Sept. 5, 2018) ("a plaintiff only bears the burden of showing that its damages calculation is a fair and reasonable approximation of its lost profits.") (quotations and citations omitted). Thus, "[w]hile the plaintiff must prove causation, it does not have to negate every conceivable intervening factor which might have caused a decline in sales." *Id.* (citing 5 McCarthy on Trademarks and Unfair Competition § 30:79 (5th ed.)). Here, Mr. Britven's decision to include sales of all Defendants' falsely advertised flanges in his lost profits calculation was reasonable, and his refusal to simply assume without evidence, that "████████████████████████████████████████████████████

██████████" Doc. 95 at 20, is not a reason to exclude his testimony.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion to exclude the expert report and testimony of Plaintiffs' expert, Thomas W. Britven should be denied.

Dated: February 14, 2019                    Respectfully submitted,

                                            *s/Marc Collier*
                                            _____
                                            **Saul Perloff**
                                              Attorney-In-Charge
                                              Texas Bar No. 00795128
                                              S.D. Texas Federal ID No. 20748
                                              saul.perloff@nortonrosefulbright.com
                                            **Katharyn Grant**
                                              Texas Bar No. 24050683
                                              S.D. Texas Federal ID No. 641461
                                              katharyn.grant@nortonrosefulbright.com
                                            NORTON ROSE FULBRIGHT US LLP
                                            300 Convent Street, Suite 2100
                                            San Antonio, Texas 78205
                                            Tel. 210.224.5575

                                            **Marc B. Collier**
                                              Texas Bar No. 00792418
                                              S.D. Fed. Bar No. 24057
                                              marc.collier@nortonrosefulbright.com
                                            **Robert L. Rouder**
                                              Texas Bar No. 24037400
                                              S.D. Texas Federal ID No. 3108753
                                              robert.rouder@nortonrosefulbright.com
                                            NORTON ROSE FULBRIGHT US LLP
                                            98 San Jacinto Blvd., Suite 1100
                                            Austin, Texas 78701-4255
                                            Tel. 512.474.5201

                                            **ATTORNEYS FOR PLAINTIFFS**
                                            **BOLTEX MFG. CO. and**
                                            **WELDBEND CORPORATION**

**Carmine R. Zarlenga**
S.D. Texas Federal ID No. 3144210
czarlenga@mayerbrown.com
**Michael Lindinger**
S.D. Texas Federal ID No. 3144212
mlindger@mayerbrown.com
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
Tel. 202.263.3000

**ATTORNEYS FOR
PLAINTIFF/COUNTER-DEFENDANT
WELDBEND CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing to be electronically filed with the Clerk of the Court using the ECF-system for the Southern District of Texas and that the ECF-system will send a Notice of Electronic Filing to all CM/ECF participant(s) on this the 14th day of February 2019.

*s/Marc Collier*

Marc Collier

*Attorneys for Plaintiffs*
