United States District Court
For the Southern District of Texas
Houston Division

**Boltex Manufacturing Company, L.P. and Weldbend Corporation**
*Plaintiffs/Counter-Defendants*

**v.**

**Ulma Forja S. Coop a/k/a Ulma Piping and Ulma Piping USA Corp..**
*Defendants/Counter-Plaintiffs*

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF DR. DANA J. MEDLIN

### REDACTED VERSION

**NORTON ROSE FULBRIGHT US LLP**

**Saul H. Perloff**
Texas Bar No. 00795128
S.D. Texas Federal ID No. 20748
saul.perloff@nortonrosefulbright.com

**Katharyn A. Grant**
Texas Bar No. 24050683
S.D. Texas Federal ID No. 641461
katharyn.grant@nortonrosefulbright.com

300 Convent Street, Suite 2100
San Antonio, Texas 78205
Tel. (210) 224-5575

**NORTON ROSE FULBRIGHT US LLP**

**Marc B. Collier**
Texas Bar No. 08235900
S.D. Fed. Bar No. 24057
marc.collier@nortonrosefulbright.com

**Robert L. Rouder**
Texas Bar No. 24037400
S.D. Texas Federal ID No. 3108753
robert.rouder@nortonrosefulbright.com

98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701-4255
Tel. (512) 474-5201

**MAYER BROWN LLP**

**Carmine R. Zarlenga**
S.D. Texas Federal ID No. 3144210
czarlenga@mayerbrown.com

**Michael L. Lindinger**
S.D. Texas Federal ID No. 3144212
mlindinger@mayerbrown.com

1999 K Street, N.W.
Washington, D.C. 20006-1101
Tel. (202) 263-3000

# TABLE OF CONTENTS

I.     NATURE AND STAGE OF PROCEEDING ................................................................. 1

II.    ISSUE BEFORE THE COURT ..................................................................................... 2

III.   SUMMARY OF THE ARGUMENT ............................................................................ 2

IV.   STANDARD OF REVIEW .......................................................................................... 5

V.    ARGUMENT ................................................................................................................ 6

      A.     Dr. Medlin's Experimental Procedure Was Appropriate ........................................ 6

      B.     Dr. Medlin Used Accepted ASTM Methods to Quantify the Changes
            He Observed in Defendants' Flanges After Normalization. .................................. 10

            1.     The Comparison Method Is An Accepted and Sufficiently
                    Precise Method of Estimating Grain Size ................................................. 13

            2.     Dr. Medlin Reliably Applied the Intercept Method to Estimate
                    the Grain Size of Defendants' Flanges .................................................... 15

VI.   CONCLUSION ........................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Adel v. Greensprings of Vt., Inc.*,
   363 F. Supp. 2d 683 (D. Vt. 2005)....................................................................13

*Alco Indus., Inc. v. Wachovia Corp.*,
   527 F. Supp. 2d 399 (E.D. Pa. 2007) ...............................................................13

*Alexander v. Martin*,
   No. 2:08-CV-400, 2010 WL 11530629 (E.D. Tex. June 7, 2010)......................9

*Bear Ranch, LLC v. Heartbrand Beef, Inc.*,
   885 F.3d 794 (5th Cir. 2018) ............................................................................5

*Benoit v. Westport Ins. Corp.*,
   No. 07-1109, 2009 WL 2970429 (W.D. La. Aug. 21, 2009)...............................9

*Bullock v. Daimler Trucks N. Am., LLC*,
   No. 08-491, 2010 WL 3922084 (D. Colo. Sept. 30, 2010).................................13

*Ctr. for Biological Diversity v. U.S. E.P.A.*,
   90 F. Supp. 3d 1177 (W.D. Wash. 2015)..........................................................12

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...............................................................2, 5, 8, 12, 13

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*,
   No. 3:11-MD-2244-K, 2014 WL 3557345 (N.D. Tex. July 18, 2014)..................15

*Diamond Offshore Co. v. Survival Sys. Int'l, Inc.*,
   No. H-11-1701, 2013 WL 371648 (S.D. Tex. Jan. 29, 2013)..............................8

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)...........................................................................................5

*Gil Ramirez Grp., LLC v. Houston Indep. School Dist.*,
   No. 4:10-CV-04872, 2016 WL 4775688 (S.D. Tex. Sep. 13, 2016) ..................8

*McGarrigle v. Mercury Marine*,
   838 F. Supp. 2d 282 (D.N.J. 2011) ...................................................................16

*Melendez–Diaz v. Massachusetts*,
   557 U.S. 305 (2009)...........................................................................................8

*Milward v. Acuity Specialty Prod. Grp., Inc.*,
   639 F.3d 11 (1st Cir. 2011)................................................................................8

*Residences at Ocean Grande, Inc. v. Allianz Global Risks U.S. Ins. Co.*,
   No. 07-22656-CIV, 2009 WL 7020044 (S.D. Fla. Sep. 9, 2009)........................16

*In re RFC and ResCap Liquidating Trust Litig.*,
 No. 13-cv-3451 (SRN/HB), No. 14-cv-1716 (SRN/HB), 2018 WL 4489685
 (D. Minn. Sep. 19, 2018) ...................................................................................................15

*Sille v. Parball Corp.*,
 No. 2:07–cv–00901–KJD–LRL, 2011 WL 2710102 (D. Nev. 2011) ......................................8

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*,
 No. CV H-09-782, 2011 WL 13134280 (S.D. Tex. July 13, 2011)...........................................8

*United States v. Haines*,
 803 F.3d 713 (5th Cir. 2015) ..................................................................................................9

*United States v. Law*,
 528 F.3d 888 (D.C. Cir. 2008).................................................................................................8

*United States v. Mitchell*,
 365 F.3d 215 (3d Cir. 2004).....................................................................................................8

**Rules and Statutes**

FED. R. EVID. 402 ...............................................................................................................2

FED. R. EVID. 403 ...............................................................................................................2

FED. R. EVID. 702 ......................................................................................................2, 5, 13

Lanham Act § 43(a) ...............................................................................................................1

Plaintiffs Boltex Manufacturing Company, L.P. ("Boltex") and Weldbend Corporation ("Weldbend") (together, "Plaintiffs"), respectfully oppose Ulma Piping USA Corp. ("Ulma USA") and Ulma Forja, S. Coop a/k/a Ulma Piping ("Ulma Forja") (together, "Defendants") motion to exclude expert opinions and testimony expressed by Dana J. Medlin, Ph.D., P.E. FASM (Doc. 93).

## I.     NATURE AND STAGE OF PROCEEDING

Plaintiffs filed this action on May 5, 2017, under § 43(a) of the Lanham Act and common law, seeking damages arising from, and injunctive relief to stop Defendant Ulma USA and its European parent Ulma Forja's false advertising and unfair competition. Complaint (Doc. 1). The Complaint alleges that Defendants falsely advertise and promote their carbon steel flanges, including advertising them as "normalized"—that is, as having undergone an additional heat treatment process that refined and homogenized the crystalline structure of the steel and improved its mechanical properties. *Id*. ¶ 1. As a result of Defendants' false advertising and unfair competition, Plaintiffs allege Defendants sold carbon steel flanges that otherwise would have been sold by Plaintiffs. *Id*. ¶ 47.

Defendants answered on August 31, 2018, asserting counterclaims against each Plaintiff, alleging they misuse phrases such as "Made in USA." Doc. 68. After the Court granted in part Plaintiffs' motion to strike certain paragraphs of Defendants' counterclaim, Doc. 84 (Order, adopting Report & Recommendation), Plaintiffs answered. Doc. 86 (Jan. 2, 2019). Discovery has now been completed, and currently pending before the Court are all parties' motions for summary judgment, as well as *Daubert/Kumho* motions.

## II.    ISSUE BEFORE THE COURT

Whether opinion testimony from Plaintiffs' well-qualified expert metallurgist Dr. Dana J. Medlin concerning the metallography and heat treatment of Defendants' flanges, based on his examination and detailed analysis of Defendants' flanges (both as-received and following heat-treatment) is sufficiently relevant and reliable pursuant to FED. R. EVID. 402, 403 and 702, and *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993), to be admissible at trial.

## III.    SUMMARY OF THE ARGUMENT

Defendants falsely advertise their ASTM A105 carbon steel flanges as "normalized," when in fact they are not. Normalization is an important process and is "mandatory" for certain classes of A105 carbon steel flanges. *See e.g.*, JAMES000668-72 (ASTM A105) (Pls.' Ex. 33, Doc. 103-21) at § 6.1.1 (mandatory for flanges above Class 300). The process is defined by the American Society for Testing and Materials (ASTM) as a heat treatment process that requires:

> reheating a steel object to a temperature above the transformation range and then cooling it in air to a temperature substantially below the transformation range ***to achieve both grain refinement and improved homogenization***.

*See* JAMES000727-34 (ASTM A941) (Pls.' Ex. 34, Doc. 103-22) (emphasis added).

Based on his examination of magnified images of the steel in Defendants' flanges (metallographs) Dr. Dana Medlin—a Ph.D. metallurgist, fellow in the American Society of Materials (ASM), and frequent lecturer on heat treatment with more than 25 years of experience—concluded that that Defendants' A105 flanges are ***not*** normalized. As Dr. Medlin will tell the jury, Defendants' flanges exhibit a heterogeneous (not homogenous) grain structure with a coarse and uneven grains consistent with ***as-forged, un-treated*** steel. The steel in Defendants' flanges only becomes refined and homogenous after the flanges are actually heat-treated—a process both Plaintiffs and Dr. Medlin undertook. *See e.g.*,



(Etched microstructure of "as received" (left) and "normalized" (right) samples taken from the same Ulma flange, ***at the same magnification***, as depicted in Figure 203 of Nov. 7, 2018 Expert Report of Dana J. Medlin, Ph.D., P.E. FASM ("Medlin Report") (Pls.' Ex. 6, Doc. 103-5 at 84).

Dr. Medlin's conclusion—that Ulma did not normalize its flanges— ███████████ ███████. After Dr. Medlin had already examined Ulma's flanges—and approximately sixteen months after Plaintiffs' filed suit based on this testing—█████████████████████ ███████████████████████████████████████ ████████████ *See* Errasti Dep. 105:25-107:5 ████████ ████████████████████████████████████████████ ████████████ *id.* 108:17-21 ███████████████████████ ███████████████████████████████████████████[1] However, the effects of forging and heat treatment on the internal microstructures exhibited by steel are outside the typical juror's experience. Dr. Medlin will thus assist the jury in understanding the tale told by Defendants' steel i.e., that normalizing steel produces a dramatic change in the microstructure that is evident even to a lay observer. While Dr. Medlin will offer his opinions as to the scientific

---

[1] Exhibit 9 to the Declaration of Katharyn Grant ("Grant Decl."), contemporaneously filed herewith. All exhibits cited herein are attached to Dr. Grant's declaration.

validity and appropriateness of his own conclusions regarding Defendants' flanges, one of his primary roles will be that of a teacher about steel. Defendants do not dispute Dr. Medlin's impressive credentials or his extensive qualifications to serve in this role.

Defendants' misunderstanding and mischaracterization of the methodology Dr. Medlin used to reach his (███████████████) conclusion about the heat treatment of their flanges is not a basis for excluding or limiting his testimony. Dr. Medlin's testing rests on a simple well-supported premise—normalizing will refine the grain structure of an unnormalized flange, but not a flange that has already been heat treated. Defendants' complaint that he did not demonstrate this principle using Boltex's flanges (with a known heat treatment history) is a inapt; the ***purpose*** of normalization is grain refinement and Defendants' own testing confirms that heat treatment causes a significant refinement in grain size. Moreover, as Dr. Medlin explained, it is "fundamental metallurgy" that once the strain energy in a flange has been consumed in recrystallization, further heat treatment cannot produce additional grain refinement. Any questions concerning this premise can be addressed on cross-examination.

Defendants' additional assertion that Dr. Medlin's experiment lacked adequate controls is incorrect; by comparing the grain structure from samples taken from each Defendants' flanges both before and after heat treatment, Dr. Medlin allowed each flange to serve as its ***own*** control. Dr. Medlin also used not one, but two well-accepted ASTM standard methods to quantify the degree of grain refinement he observed in Defendants' flanges after heat treatment, and obtained nearly identical results using both methods. Further, Defendants' complaints about the "accuracy" of the ASTM comparative method, and Dr. Medlin's purported "failure" to adjust his grain size numbers based on a calculation of the volume fraction of ferrite miss the mark; Dr. Medlin's conclusions rely not on the absolute value of his grain size measurements, but instead

on the magnitude of the difference he observed before and after heat treatment. In sum, his procedure controls for and eliminates any possibility of error due to biases in the grain size measurements.

Defendants' motion to exclude Dr. Medlin's testimony is baseless and should be denied.

## IV.  STANDARD OF REVIEW

The purpose of Federal Rule of Evidence 702 is to allow probative, helpful expert testimony, while rooting out inadmissible junk science. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

"A trial court has broad discretion to admit expert opinion evidence . . . ." *Bear Ranch, LLC v. Heartbrand Beef, Inc.*, 885 F.3d 794, 802 (5th Cir. 2018); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997). While the Court has a "gatekeeping function" to " "ensure that any and all scientific testimony is not only relevant, but reliable," *Bear Ranch*, 885 F.3d at 802 (quotations and ellipses omitted), "mere disagreement" with an expert's conclusions is not a basis for exclusion. *Id.* Rather, "*Daubert* recognizes that a '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert,* 509 U.S. at 596).

# V.  ARGUMENT

## A.  Dr. Medlin's Experimental Procedure Was Appropriate

In the context of forged steel, "normalizing" describes both a process (heat treatment) and an outcome (a refined and homogenous grain structure). Neither the ASTM nor any other organization describes a "test" for determining whether a steel forging has been normalized.  The ASTM does, however, describe methods for measuring grain size.

Therefore, to determine whether Defendants' purportedly "normalized" flanges had been heat treated[2], Dr. Medlin designed a test procedure founded on two well-known principles:  (1) a normalizing heat treatment will refine the grain structure of forged carbon steel, and (2) heat treating low carbon steel that has already been heat treated will produce only minimal if any change in its microstructure. Using ten of Defendants' purportedly normalized ASTM A105 flanges that Boltex purchased on the open market, Dr. Medlin removed two metallographic samples from the thickest portion of each flange, normalized one sample, and then compared the resulting microstructure to that of the "as received" sample from the same flange. *See* Medlin Report at 6 (Pls.' Ex. 6, Doc. 103-2 at 7). In nearly every flange he examined, the normalizing heat treatment produced a grain structure that was significantly finer (in most cases *4-8x* finer) than that of the "as received" sample. Thus, Dr. Medlin concluded—*correctly*—that Defendants' flanges had not been previously normalized. Medlin Dep. 80:10-13 (Grant Decl. Ex. 14) ("The results that we got from the first normalization on these components showed that these flanges had not been properly normalized to begin with.")

---

[2] Dr. Medlin's tests on Defendants' flanges were conducted *before* Defendants' admitted that their ASTM A105 flanges had not been heat treated. Medlin Dep. 47:2-15 (Grant Decl. Ex. 14) (Medlin received Ulma flanges described in his report in November 2016 and September 2017).

Defendants' argument that Dr. Medlin "Failed to Use Proper Control Groups," Doc. 93 at 4, is misguided, and reflects fundamental misunderstandings of Dr. Medlin's report and testimony. No one disputes that normalization reduces grain size and "banding," i.e., chemical segregation, in the steel; indeed, that is the very purpose of normalization. *See* JAMES000727-34 at 731 (Pls.' Ex. 34, Doc. 103-22) (ASTM A941 definition of "normalizing"). Defendants' expert Brad James agrees that ASTM A105 steel should display a finer grain structure after it has been normalized than before. James Dep. 17:5-10 (Grant Decl. Ex. 12). And in fact, Defendants' own tests demonstrate this phenomenon. *See e.g.*, UlmaForja00275472 (█████████████████ ████████████████████████████████████████████████████████████ ███████████████████) (Grant Decl. Ex. 30); *see also* JAMES007738 (Pls.' Ex. 35, Doc. 104-22) (█████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████") ; James Dep. 208:17-212:7 (confirming same).[3]

There was no need for Dr. Medlin to independently prove this already well-established fact.

However, the benefits that can be attained through normalization have limits. Although repeated normalizations can help high alloy steels used for tooling and very large parts, for plain-carbon and low alloy steels, "[t]he microstructural improvements resulting from the first normalization treatment cannot be enhanced by a second normalization." Medlin Report at 3 (Pls.' Ex. 6, Doc. 103-2 at 4)*; see also* F. Bernobich Dep. 71:9-16 (Grant Decl. Ex. 3) ("Now, that

---

[3] As Defendants note, Chicago Spectro Service Laboratory also observed a 1.5 to 2.5 change in the grain size of Defendants' flanges after they were subjected to a normalizing heat treatment. Doc. 93 at 6-7; *see also* WEL-UL-114034 (Grant Decl. Ex. 37), WEL-UL-114050 (Defs.' Ex. 10, Doc. 93-13). Although Defendants argue that Chicago Spectro concluded that the Ulma flanges "had been properly normalized," *id.* at 7, this language does not appear in either report. In all likelihood, Chicago Spectro assumed that its normalization procedure was a "second" normalization, because all of Defendants' flanges were stamped as "A105N." In light of Defendants' admission that until sometime in 2017, none of the "ASTM A105N" flanges they sold into the U.S. were actually heat treated, the normalization procedure applied by Chicago Spectro to Defendants' flanges was in fact a "first" normalization.

is a classic test for -- classic test for finding out whether something has been normalized or not been normalized. Because if -- if -- if we subjected that same flange or that same second sample to normalizing again, there would be an insignificant difference in the change of the microstructure."). As Dr. Medlin further explained, the reason why is "fundamental metallurgy":

> one of the requirements, you know, that's the driving force from the metallurgical point of view, is strain in the lattice from the prior forging operation. So once you reheat it for the first normalization process, you have eliminated or substantially reduced that strain in the crystal structure of the metal, and that strain is used to crystallize, form smaller grains. So once you've done that and you've normalized it a second time, without any mechanical processing to the steel, most of that strain is gone, to be used as a driving force for recrystallization.

Medlin Dep. 78:17-79:8 (Grant Decl. Ex. 14). Aside from characterizing Dr. Medlin's analysis as a "hypothesis," Doc. 93 at 5, Defendants offer no reason why the analysis is ill-founded or otherwise incorrect. Any concerns about his analysis may be addressed on cross examination. *Gil Ramirez Grp., LLC v. Houston Indep. School Dist.*, No. 4:10-CV-04872, 2016 WL 4775688, at *3 (S.D. Tex. Sep. 13, 2016) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.") (quoting *Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 22 (1st Cir. 2011)).

Dr. Medlin was also clear that the reason he believed a refinement of at least 1.5 grain size units reflected the effect of an initial normalization is because a change of this magnitude represents more than simple measurement error. Medlin Dep. 76:4-16 (Grant Decl. Ex. 14) ("And so the plus or minus errors of maybe half or one ASTM grain size unit, you know, can mask any changes. But for the most part, comparing an as-forged to a normalized component -- if I see an improvement of one and a half or two units, to me, that's beyond the measurement error, and that's showing me that there's a substantial change in the grain size.") His decision criteria, which

also considered the existence of fine and coarse lamellar microstructures, and Widmanstatten ferrite was neither arbitrary nor "subjective."[4]

Defendants' further suggestion that Dr. Medlin should have normalized the Boltex flanges in his possession to "create[] a control group" is a strawman. The purpose of a "control" in an experiment is to minimize the effects of variables other than the independent variable. *See* Reference Manual on Scientific Evidence at 296 (3d ed.) (2011) at 218-19 (Pls.' Ex. 49, Doc. 103-30 at 34-35) (outcomes in groups exposed to some factor are compared against outcomes in unexposed "control" group). Dr. Medlin's experiment had an appropriate "control"—he compared the microstructure of Defendants' flanges after normalization to the microstructure of the same flanges before heat treatment. There are no other factors that might have impacted the microstructure of Defendants' flanges that the Boltex flanges could have acted as a "control" for. That Defendants think Dr. Medlin could have or should have run an additional experiment using

---

[4] Although Defendants repeatedly suggest that only "objective" observations are sufficiently reliable to be admissible, *see e.g.*, Doc. 93 at 6, this is not true. As the Supreme Court recognizes, an expert's methodology may be admissible even though it "requires the exercise of judgment . . . that might be explored on cross-examination." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 320 (2009); *see also, e.g.*, *Sille v. Parball Corp.*, No. 2:07-cv-00901-KJD-LRL, 2011 WL 2710102, at *2 (D. Nev. 2011) (noting that "subjective tests, clinical observations and professional judgment" are often admissible, particularly where objective tests are unavailable); *see also Ultraflo Corp. v. Pelican Tank Parts, Inc.*, No. H-09-782, 2011 WL 13134280, at *3 (S.D. Tex. July 13, 2011) ("An expert's testimony can be based primarily if not solely on personal experience."). That certain observations, *e.g.*, identifying the presence of fine and coarse lamellar microstructures and Widmanstatten ferrite, do not lend themselves to an "objective" measurement, does not make them inadmissible. Fed. R. Evid. 701 (even non-experts may offer opinion testimony that is "rationally based on the witness's perception"); *Tufariello v. Long Island R. Co.*, 458 F.3d 80,89-91 (2d Cir. 2006) (witness could testify that horns were "very, very loud" despite having no objective measurement of sound levels). Moreover, the fact that experts may rely on the exercise of judgment in their work does not prevent them from offering reliable, admissible opinions in court. *See e.g., United States v. Law*, 528 F.3d 888, 913 (D.C. Cir. 2008) (affirming the admission of a forensic chemist's "qualitative identification" of drug residue despite the subjective judgment called for in such an opinion); *United States v. Mitchell*, 365 F.3d 215, 241 (3d Cir. 2004) (subjective nature of fingerprint analysis does not bar its admissibility under *Daubert*); *Diamond Offshore Co. v. Survival Sys. Int'l, Inc.*, No. H-11-1701, 2013 WL 371648, at *8 (S.D. Tex. Jan. 29, 2013) (admitting expert's opinions that were based "on facts in the record as well as his years of experience" in the relevant field); *United States v. Haines*, 803 F.3d 713, 731 (5th Cir. 2015) (noting an expert witness "rel[ies] properly on his general experience and reliable methodology").

the Boltex flanges—which are not at issue in this case—does not make Dr. Medlin's opinion testimony concerning the Ulma flanges inadmissible. *Benoit v. Westport Ins. Corp.*, No. 07-1109, 2009 WL 2970429, at *3 (W.D. La. Aug. 21, 2009) (fact that a different expert might have chosen a different method does not render expert's opinion inadmissible); *Alexander v. Martin*, No. 2:08-CV-400, 2010 WL 11530629, at *3 (E.D. Tex. June 7, 2010) ("However, the utilization of a different valuation method does not necessarily render an expert's opinion unreliable.")

**B.     Dr. Medlin Used Accepted ASTM Methods to Quantify the Changes He Observed in Defendants' Flanges After Normalization.**

The differences in the microstructure of Defendants' flanges before and after heat treatment are apparent even to lay observers, and whether or not Dr. Medlin is allowed to present his estimates of the average grain size exhibited by each sample, the jury will be allowed to view these images and draw their own conclusions about the impact heat treatment had on Defendants' purportedly "normalized" flanges. Nonetheless, there is no reason to prevent Dr. Medlin from testifying about his grain size measurements.

Grain size numbers are an estimate of the number of grains that fit within a square inch of a metallograph at 100x magnification. Eagar Report at 6, n.5 (Grant Decl. Ex. 1). Each unit increase in the grain size number corresponds to a doubling in the number of grains that fit within the test area. Bigger grain size *numbers* correspond to smaller *grains* in steel (i.e., number eight grains are 4x smaller than a number six grains):



*Id.* at Figure 3, p. 8.

Methods for estimating the grain size in metallic materials are described in ASTM E112, "Standard Test Methods for Determining Average Grain Size." (Grant Decl. Ex. 20). These methods include the "Comparison Procedure," *id.* § 10, "Planimetric (or Jeffries') (3) Procedure, *id.* § 11, and various intercept procedures. *Id.* § 12-14. Whichever method is used, the ASTM cautions that grain size measurement is never exact. *See id.* § 5.1 ("It is important, in using these test methods, to recognize that the measurement of average grain size is not an exact measurement.")

To help the jury understand the magnitude of the grain refinement produced by normalizing Defendants' flanges, Dr. Medlin estimated the grain size of each sample he examined using **both** the comparison method described in ASTM E112 § 10, and the circular intercept procedure described in ASTM E112 § 12. *Id.* Dr. Medlin's report summarizes the

estimates obtained using each procedure. *E.g.* Medlin Report at 29-30 (Pls' Ex. 6, Doc. 103-3 at 10-11)

**Table 3**. The ASTM Grain Size Comparison Between the As-Received and Normalized Ulma Flanges using the ASTM Comparison Procedure.

| As-Received Flange Samples | | | Normalized Flange Samples | | |
|---|---|---|---|---|---|
| **Sample ID** | **Hoop** | **Radial** | **Sample ID** | **Hoop** | **Radial** |
| UL-1-A | 6.0 | 6.0 | UL-1-B | 7.5 | 7.5 |
| UL-2-A | 7.5 | 7.0 | UL-2-B | 8.5 | 8.0 |
| UL-3-C | 4.0 | 4.5 | UL-3-D | 7.5 | 8.0 |
| UL-4-A | 4.5 | 5.5 | UL-4-B | 8.0 | 8.0 |
| *Average* | *5.5* | *5.7* | *Average* | *7.9* | *7.9* |

**Table 4**. The ASTM Grain Size Comparison Between the As-Received and Normalized Ulma Flanges using the ASTM Circular Intercept Procedure.

| As-Received Flange Samples | | | Normalized Flange Samples | | |
|---|---|---|---|---|---|
| **Sample ID** | **Hoop** | **Radial** | **Sample ID** | **Hoop** | **Radial** |
| UL-1-A | 6.5 | 6.5 | UL-1-B | 8.0 | 8.0 |
| UL-2-A | 8.0 | 7.5 | UL-2-B | 8.5 | 8.5 |
| UL-3-C | 5.0 | 5.0 | UL-3-D | 8.0 | 8.5 |
| UL-4-A | 5.5 | 6.0 | UL-4-B | 8.5 | 8.5 |
| *Average* | *6.3* | *6.3* | *Average* | *8.3* | *8.4* |

*NOTE: Grain Size Numbers (G) were calculated from the Mean Value of $N_A$*

As these tables show and ASTM E112 explains, different grain size estimation techniques can produce slightly different values. However, regardless of the method used, Dr. Medlin's estimates consistently show that the microstructure of Defendants' flanges became significantly more refined (up to 3.5 unit increase in grain size number) after normalizing.

Defendants' criticisms of Dr. Medlin's grain size measurements miss the point of Dr. Medlin's analysis, which to objectively describe the impact of heat treatment on the microstructure of Defendants' flanges. Defendants' various assertions concerning the requirements of ASTM E112 are unsupported by the testimony of Defendants' own witnesses or

metallography experts and reflect a fundamental misreading of both Dr. Medlin's testimony and ASTM E112 itself.

### 1. The Comparison Method Is An Accepted and Sufficiently Precise Method of Estimating Grain Size

Defendant's contention that Dr. Medlin's grain size estimates are unreliable because he "chose the least accurate comparison method," Doc. 93 at 8, misapprehends the standard laid out by *Daubert*, and more fundamentally the nature of Dr. Medlin's analysis and the meaning of the term "accuracy."

The comparison method is the most commonly used method for estimating grain size in metallic materials, probably because it is the fastest and most convenient. ASTM E112 §10.2 (Grant Decl. Ex. 20) (comparison method is "more convenient"); Medlin Dep. 120:15-122:3 (Grant Decl. Ex. 14) (noting that the intercept method is "much slower"). Despite its tendency to slightly underestimate actual grain size, the ASTM deems the comparison method suitable for most applications. ASTM E112 §§ 4.1, 10, 17.3 (comparison method "provide[s] acceptable precision for most commercial applications.")

"Accuracy" is the "proximity of a measurement to the true value." *Ctr. For Biological Diversity v. U.S. E.P.A.*, 90 F. Supp. 3d 1177, 1213 n.29 (W.D. Wash. 2015). Defendants' argument that Dr. Medlin should have used a different method with a "higher degree[] of accuracy" for estimating grain size, rather than one of the ASTM approved standard methods he actually did use, does not make his opinions inadmissible. *Alco Indus., Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 408 (E.D. Pa. 2007) ("This is not to say that it is necessarily the best method, but it easily satisfies the threshold requirement of reliability for Rule 702 purposes."); *Bullock v. Daimler Trucks N. Am., LLC*, No. 08-491, 2010 WL 3922084, at *4 (D. Colo. Sept. 30, 2010) ("Rule 702 and *Daubert* do not require an expert to use the best method available, they

only require that the evidence be relevant and reliable.") (quoting *Adel v. Greensprings of Vermont, Inc*., 363 F. Supp. 2d 683, 689 (D. Vt. 2005)). More importantly, Dr. Medlin's analysis did not rely on the actual value of the grain size number he measured either before or after Defendants' flanges were normalized; rather Dr. Medlin's analysis focused on the **change** in grain size he saw after heat treatment. Any "general bias towards coarseness" stemming from Dr. Medlin's use of the comparative method—or alternatively, his purported "failure to adjust his grain size estimates using a volume-fraction calculation," Doc. 93 at 11—would equally impact both his "before" and "after" heat treatment measurements; they would **not** impact the magnitude of the difference between the measurements. Dr. Medlin's data makes this plain. Although the grain size estimates he obtained using the comparison method tend to have slightly lower values than the estimates he obtained applying the circular intercept method to the same sample, the **changes** in grain size revealed by the two methods are almost **identical**:

| Sample | Grain size Change Using Comparative Method (Hoop) | Grain Size Change Using Intercept Method (Hoop) | Grain Size Change Using Comparative Method (Radial) | Grains Size Change Using Intercept Method (Radial) |
|---|---|---|---|---|
| UL-1 | 1.5 | 1.5 | 1.5 | 1.5 |
| UL-2 | 1.0 | 0.5 | 1.0 | 1.0 |
| UL-3 | 3.5 | 3.0 | 3.5 | 3.5 |
| UL-4 | 3.5 | 3.0 | 2.5 | 2.5 |
| UL-7 | 1.0 | 1.5 | 2.0 | 2.0 |
| UL-8 | 0.5 | 0.5 | 0.0 | 0.5 |
| UL-9 | 1.5 | 2.5 | 1.5 | 1.5 |
| UL-10 | 1.5 | 2.0 | 1.5 | 1.5 |
| UL-11 | 1.0 | 1.0 | 1.5 | 1.0 |
| UL-12 | 2.5 | 1.5 | 2.5 | 2.0 |

Defendants' suggestion that any grain size difference following heat treatment is not real, but results from the "known error rate of the comparison technique," Doc. 93 at 9, is demonstrably wrong. One reason Dr. Medlin concluded that a change in grain size of 1.5 units or

more was significant was because this value is **_greater_** than the random variance associated with the comparison method. *See* ASTM E112 § 19.8 (Defs.' Ex. 2, Doc. 93-4) ("Grain size ratings using the comparison chart method by an individual metallographer will vary within 0.5 G units.") And in light of the figures in Dr. Medlin's 87-page report, this argument is not plausible. As these images show, heat treatment produced dramatic changes in the microstructure of Defendants' flanges that are easily seen by even non-metallurgists:



Etched microstructure of "as received" (left) and "normalized" (right) samples taken from the same Ulma flange, at the same magnification, as depicted in Figure 204 of Medlin Report (Pls' Ex. 6, Doc. 103-5 at 25)

### 2. Dr. Medlin Reliably Applied the Intercept Method to Estimate the Grain Size of Defendants' Flanges

By themselves, Dr. Medlin's grain size estimates using the comparative method provide a reliable basis for his opinions. Nonetheless, Dr. Medlin repeated his grain size estimates using the circular intercept method described in ASTM E112 § 12 to make sure that Defendants' expert would have a basis for comparison if he decided to replicate Dr. Medlin's work:

> And then as I was doing the preliminary work to start the report, the thought occurred to me that if I was the other expert and received a report on grain size measurements, I would take the images from that report, expand them up, make copies and expand them in size to the appropriate magnification, and then confirm the grain size measurements with my own measurement technique. And

> that would be -- the only way you could do it -- you can't do it really easily on the comparative method, because you can't put a picture into the microscope. That doesn't work. So the next method is the intercept method. And so I wanted to verify that if someone did that, they'd get very similar results to our comparison method. And that worked out.

Medlin Dep. 128:9-129:4 (Grant Decl. Ex. 14). In fact, Dr. Medlin's grain size estimates made using the intercept method, while generally slightly higher (0.5 to 1.0 units) in magnitude, are otherwise consistent with his estimates using the comparative method. And as shown above, his estimates of the change in grain size observed after heat treatment are ***nearly identical*** regardless of which method he used.

Defendants' criticism that Dr. Medlin did not review at least five fields per sample, or calculate confidence intervals for his estimates, is not only wrong—Dr. Medlin calculated standard deviations for his grain size estimates, which are "one and the same" as confidence intervals, Medlin Dep. 246:19-247:11 (further confirming that Defendants have the necessary data to do their own calculation of confidence intervals for his measurements)—but at most goes only to the weight to which his data should be given by the jury, and not its admissibility. *In re RFC and ResCap Liquidating Trust Litig.*, No. 13-cv-3451 (SRN/HB), Case No. 14-cv-1716 (SRN/HB), 2018 WL 4489685 at *6 (D. Minn. Sep. 19, 2018) ("doubts about precision goes [sic] to the weight and not admissibility of an expert's opinion") (internal quotes and citations omitted); *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, No. 3:11-MD-2244-K, 2014 WL 3557345, at *14 (N.D. Tex. July 18, 2014) ("To the extent [defendant] is arguing that [expert] did not follow the ASTM standards or that his calculations are incorrect, such argument goes to the weight and not the admissibility of the evidence."); *McGarrigle v. Mercury Marine*, 838 F. Supp. 2d 282, 292 (D.N.J. 2011) ("If there is a gap between the ASTM [ ] standards as written and as applied by Dr. Fisher, any inconsistencies go to the weight of the evidence, not to its admissibility"); *Residences at Ocean Grande, Inc. v. Allianz Global Risks*

*U.S. Ins. Co.*, No. 07-22656-CIV, 2009 WL 7020044, at \*3, n.3 (S.D. Fla. Sep. 9, 2009) (where testing was otherwise consistent with ASTM protocols, deviations in samples used for ASTM testing went to the weight of a report's finding, not its admissibility). At most, Defendants' critique suggests that Dr. Medlin's estimates may not achieve the high precision of "better than 0.25 grain size units," that can be achieved using this method. *See* ASTM E112 § 14.2.3 (Grant Decl. Ex. 20) ("As with all intercept procedures, the precision of the measurement increases as the number of counts increases"). Defendants' nitpicking does not alter the basic fact that, as Dr. Medlin ███ concluded, Defendants did not normalize their ASTM A105 flanges.

## VI.    CONCLUSION

The Court should DENY Defendants' motion to exclude expert Dana J. Medlin's opinions and testimony.

Dated: February 14, 2019

Respectfully submitted,

*s/Kathy Grant*

**Saul Perloff**
Attorney-In-Charge
Texas Bar No. 00795128
S.D. Texas Federal ID No. 20748
saul.perloff@nortonrosefulbright.com
**Katharyn Grant**
Texas Bar No. 24050683
S.D. Texas Federal ID No. 641461
katharyn.grant@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
300 Convent Street, Suite 2100
San Antonio, Texas 78205
Tel. 210.224.5575 | Fax 210.270.7205

**Marc B. Collier**
Texas Bar No. 00792418
S.D. Fed. Bar No. 24057
marc.collier@nortonrosefulbright.com
**Robert L. Rouder**
Texas Bar No. 24037400
S.D. Texas Federal ID No. 3108753
robert.rouder@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701-4255
Tel. 512.474.5201 | Fax 512.536.4598
**ATTORNEYS FOR PLAINTIFFS**
**BOLTEX MFG. CO. and**
**WELDBEND CORPORATION**

**Carmine R. Zarlenga** (*Pro Hac Vice*)
D.C. Federal Bar ID No. 386244
S.D. Texas Federal ID No.
**Michael Lindinger** (*Pro Hac Vice*)
D.C. Federal Bar ID No. 982228
S.D. Texas Federal ID No.
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
Tel. 202.263.3000 | Fax 202.263.3300

**ATTORNEYS FOR PLAINTIFF/COUNTER-**
**DEFENDANT WELDBEND**
**CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing to be electronically filed with the Clerk of the Court using the ECF-system for the Southern District of Texas and that the ECF-system will send a Notice of Electronic Filing to all CM/ECF participant(s) on this the 14th day of February 2019.

*s/Kathy Grant*

Kathy Grant

*Attorneys for Plaintiffs*
