IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BOLTEX MANUFACTURING COMPANY, L.P., *et al.*, | § § § § | |
| Plaintiffs, | § | |
| VS. | § § | CIVIL ACTION NO. 4:17-CV-1400 |
| ULMA PIPING USA CORP., *et al.*, | § § § | |
| Defendants. | § | |

## **MEMORANDUM & ORDER**

Defendants Ulma Forja S. Coop. and Ulma Piping USA Corp. (hereinafter collectively referred to as "Ulma" or "Defendants") have filed a Motion for Summary Judgment (Doc. No. 92). Plaintiffs Boltex Manufacturing Company, LP and Weldbend Corporation (hereinafter collectively referred to as "Boltex" or "Plaintiffs") have filed a Response (Doc. No. 114). Defendants subsequently filed a reply (Doc. No. 127).

### I.  **Factual Background**

This dispute arises between carbon steel flange manufacturers. A flange is a "disc collar or ring that attaches to a pipe, providing a method of connecting pipes, valves, pumps and other equipment to form a piping system." (Doc. No. 1 at 4). Plaintiffs allege that Defendants falsely advertise their product in violation of § 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a).[1]

---

[1] Section 1125 (a) provides:
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
    (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

1

Specifically, Plaintiffs contend that Defendants misrepresent that they "normalize" their flanges.

Normalization is a heat treatment process that changes some of the properties of steel to give it a "more fine-grained homogenous microstructure and more predictable properties and machinability." (*Id.* at 8). In other words, normalization makes the steel more durable. The process involves reheating the steel, holding it at that temperature, and subsequently cooling it at room temperature, and consequently, involves additional time and resources. Accordingly, it is more expensive for manufacturers to produce normalized flanges than unnormalized ones.

The American Society of Testing and Materials ("ASTM") has a published set of standards and specifications applicable to carbon steel flanges to ensure uniformity in the industry. Some customers will only purchase certain flanges if they are normalized according to industry standards.

Plaintiffs' normalization processes comply with the ASTM standards, which require manufacturers to apply the heat treatment described above to certain types of flanges. Plaintiffs stamp normalized flanges with the code "A105N" to indicate their compliance with the ASTM standards. The "N" represents "normalization." Plaintiffs charge more for these normalized flanges. Plaintiffs also indicate normalization in a Mill Test Report ("MTR"), an industry-standard report, which Plaintiffs liken to a birth certificate for a flange because it indicates certain specifications about the flange. (*Id.* at 7). Plaintiffs point out that customers cannot simply look at a flange to determine whether it has been normalized; rather, customers rely on the manufacturers to let them know whether a flange has been normalized or not. (Doc. No. 1 at 6, 7).

Plaintiffs and Defendants sell their flanges to distributors who in turn sell the flanges to customers. Some of these distributors include: DNOW, L.P., Industrial Valco, and Wolseley

Industrial Group/Ferguson.[2] Plaintiffs claim that Defendants misrepresent the normalization-status of their flanges "in the catalogs, brochures, price lists and websites of third-party distributors of Ulma flanges," "in the MTRs that accompany each flange," and "by stamping A105N" on each flange. (Doc. No. 1 at 11–13). Specifically, Plaintiffs state:

> Defendants advertise and promote the flanges as ASTM "A105N" indicating that the flanges (a) meet all the requirements of ASTM A105 and (b) are normalized. Defendants' purported ASTM "A105N" compliant flanges are advertised, among other places, in catalogs Defendants distribute to their customers and potential customers and make publicly available via their website . . .[and] in the catalogs, brochures, price lists and websites of third-party distributors of Ulma flanges . . . Defendants further promote their flanges as normalized and as compliant with the requirements of ASTM A105 in the MTRs that accompany each flange . . . Defendants further advertise and promote their flanges as normalized and complying with ASTM A105 by stamping "A105N" on the flanges themselves.

(Doc. No. 1 at 11–13). According to Plaintiffs, Defendants flanges do not comply with ASTM standards for normalization. Plaintiffs further contend that since non-normalized flanges can be manufactured and sold at a lower cost, Defendants' misrepresentations allow them to unfairly undercut Plaintiffs' prices and interfere with Plaintiffs' market share. Plaintiffs have sued Defendants for false advertising and unfair competition in violation of the Lanham Act as well as common law unfair competition.

## II.     Standards of Review

### A. Summary Judgment

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*,

---

[2] *See* Alex Man Deposition as Representative of DNOW, L.L.P. (Doc. No. 122, Ex. No. 12 at 9); Robert Raban Deposition as Representative of Industrial Valco (Doc. No. 122, Ex. 14 at 117); Jason Smith Deposition as Representative of Wolseley Industrial Group and Ferguson (Doc. No. 122, Ex. 15 at 44).

485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex*, 477 U.S. at 321–25.

The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

### B. False Advertisement Under the Lanham Act

"The Lanham Act was enacted to protect persons engaged in such commerce against unfair competition." *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1382–84 (5th Cir. 1996) (internal quotation marks omitted). To state a prima facie case of false advertising, a plaintiff must establish: (1) a false or misleading statement of fact about a product; (2) such a statement either deceived, or had the capacity to deceive a substantial segment of potential customers; (3) the deception is material, in that it is likely to influence the consumer's purchasing decision; (4) the product is in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the statement at issue. *Derrick Petrol. Servs. v. PLS, Inc.*, Civil Action No. H–14–1520, 2017 WL 3456920, at *5 (S.D. Tex. Aug. 11, 2017). "The failure to prove the existence of any element of the prima facie case is fatal to the plaintiff's claim." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000).

4

"To obtain money damages for false advertising under § 43(a) of the Lanham Act, the plaintiff must first demonstrate that the advertisement was (1) literally false; or (2) likely to mislead and confuse customers." *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002). "For a statement to be literally false, the statement must be 'false on its face.'" *Derrick*, 2017 WL 3456920, at *5. "If the statement at issue is shown to be literally false, the court must assume that it actually misled consumers, without requiring any evidence of such deception from the plaintiff." *IQ Prods.*, 305 F.3d at 375; *see also Pizza Hut*, 227 F.3d at 497 ("[P]laintiff need not introduce evidence on the issue of the impact the statements had on customers."). However, "if the statement is . . . misleading or ambiguous . . . the plaintiff must demonstrate actual deception." *IQ Prods.*, 305 F.3d at 375. "The statements at issue must be a specific and measurable claim, capable of being proved false or being reasonably interpreted as a statement of objective fact." *Pizza Hut*, 227 F.3d at 496 (internal quotation omitted).

In *Seven-Up*, the Fifth Circuit held that in order to be actionable, the alleged misrepresentations must be within the meaning of "commercial advertising or promotion under the [Lanham] Act." *Seven-Up*, 86 F.3d at 1382–83. The Lanham Act does not explicitly define "advertising or promotion." Thus, the Circuit adopted the following test:

> In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Id.* at 1384 (holding that the requisite level of circulation and consumption may "vary according to the specifics of the industry").

5

## III. Analysis

### A. Standing

As an initial matter, Defendants argue that Plaintiffs lack Article III and prudential standing because Plaintiffs have not proven that Plaintiffs and Defendants are competitors, nor have they proven causation. (Doc. No. 92 at 33).

Article III of the United States Constitution requires that parties seeking to resolve disputes before a federal court present actual cases or controversies. U.S. Const. art. III, § 2, cl. 1. This requirement limits "the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). Plaintiff, as the party invoking the Court's jurisdiction, bears the burden of satisfying the Article III requirement by demonstrating that it has standing to adjudicate its claims in federal court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The "irreducible constitutional minimum of standing contains three elements." *Id.* at 560. First, a plaintiff must demonstrate that they have "suffered a concrete and particularized injury that is either actual or imminent." *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007). Second, a plaintiff must show that there is a causal connection between the alleged injury and the complained-of conduct—essentially, that "the injury is fairly traceable to the defendant." *Id.* Finally, standing requires that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).

In addition to the constitutional requirements for standing, "the federal judiciary has also adhered to a set of 'prudential' principles that bear on the question of standing." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982). Many opinions refer to these principles as being under the banner of "prudential" standing.

*See, e.g., Bennett v. Spear*, 520 U.S. 154, 164 (1997).

In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), the Supreme Court laid out a two-part test for prudential under the Lanham Act. "To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Id.* at 140. The Court held that "a direct application of the zone-of-interest test and the proximate-cause requirement supplies the relevant limits on who may sue." *Id.* at 134.

The first part of this test concerns "the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). Relying on the text of the Lanham Act, the Supreme Court concluded that "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 131.

The second part of this test requires that injuries be proximately caused by violations of the statute. The question presented in a proximate cause analysis "is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* at 1390. A plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Valley Forge*, 454 U.S. at 474 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Since "the Lanham Act authorizes suit only for commercial injuries, the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute." *Lexmark*, 572 U.S. at 133. Therefore a "plaintiff suing under § 1125(a) ordinarily must

show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133. "Although the classic false advertising case involves a party inducing customers to switch from a competitor by making false statements about its or the competitor's goods, this is not the only cognizable injury under Section 1125(a)." *Greater Houston Transp. Co. v. Uber Tech., Inc.*, No. 4:14-0941, 2015 WL 1034254, at *7 (S.D. Tex. Mar. 10, 2015) (citing *Lexmark*, 572 U.S. at 137). Indeed, it is "a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect only the false-advertiser's direct competitors." *Lexmark*, 572 U.S. at 136.

Defendants argue that Plaintiffs do not have standing because they lack evidence as to whether: (a) Plaintiffs and Defendants are competitors, and (b) the alleged deception was the proximate cause of Plaintiffs' purported losses. With regard to Defendants' proximate cause argument, Defendants claim that there are meaningful differences in the prices between the flanges (beyond normalization), and that Plaintiffs failed to demonstrate that Boltex has the capacity to normalize their own flanges.

Plaintiffs have demonstrated that they have suffered or are imminently threatened with a concrete and particularized injury that is fairly traceable to the challenged action. *See Lujan*, 504 U.S. at 560. Plaintiffs have provided evidence in the form of deposition testimony that Ulma's purported misrepresentations directly affect the market in which the Plaintiffs participate and that customers compare Ulma and Boltex prices. (Weldbend Rep. James Coulas Depo. Doc. No. 121, Ex. 7 at 179–80; Varner Depo. Doc. No. 122, Ex. 17 at 153). Plaintiffs have also demonstrated that "the[ir] injury is fairly traceable to the defendant." *Lujan*, 504 U.S. at 560. Plaintiffs provide evidence in the form of deposition testimony, which states that had Ulma not advertised their

flanges as normalized, "a portion of [the market] definitely would have come to Boltex." (Bernobich Depo. Doc. No. 122, Ex. 4 at 201). Finally, Plaintiffs have shown their injury could be redressed by a favorable decision. *See Lujan*, 504 U.S. at 560. Plaintiffs have provided a damages model as evidence of their purported losses. (*See* Doc. No. 122, Ex. 5). This is sufficient to enable a reasonable factfinder to find that Plaintiffs have standing under Article III. *See Lujan*, 504 U.S. at 560–61.

Plaintiffs also have prudential standing under the Lanham Act. Defendants argue that because Boltex is a domestic manufacturer and Ulma is a foreign manufacturer, the two companies are not competitors. As such, they argue, Plaintiffs are outside of the zone-of-interest. According to Defendants, customers usually choose either a foreign or domestic brand of flange and stick to it. Plaintiffs' evidence refutes this argument. Plaintiffs provide deposition testimony from Defendants' expert, Thomas Varner, who stated that "there are certain segments in which [Boltex and Ulma] compete." (Varner Depo. Doc. No. 122, Ex. 17 at 153–54, 260). Plaintiffs also provide deposition testimony from Weldbend Representative James Coulas, agreeing that Weldbend and Ulma compete in the marketplace for carbon steel flanges and that "all domestic [flange] manufacturers compete with all imported [flange] manufacturers" because they all "sell the same products." (Coulas Depo. Doc. No. 121, Ex. 7 at 179–80). Thus, Plaintiffs have demonstrated that a genuine issue of material fact remains concerning whether Boltex and Ulma are competitors. As competitors, Plaintiffs would fall squarely within the zone-of-interest described by the Court in *Lexmark*. *See Lexmark*, 572 U.S. at 136.

Next, Plaintiffs have also demonstrated that a fact issue remains regarding whether the alleged harm was caused by a violation of the Lanham Act. As described above, Plaintiffs present evidence that they lost sales based on Ulma's allegedly false statements about whether their flanges

9

were normalized because non-normalized flanges cost less to manufacture and can be offered at a lower price to customers. This is the type of harm contemplated by the Lanham Act. *See Lexmark*, 572 U.S. at 133. Thus, the Court finds that Plaintiffs have prudential standing and now turns to the Defendants' substantive arguments against Plaintiffs' claims.

## B. False Advertisement Claim

Defendants urge the Court to grant summary judgment on Plaintiffs' claim on the grounds that Plaintiffs failed to produce evidence as to any element of their Lanham Act claim. First, Defendants argue that Plaintiffs lack evidence that Defendants' statements were either literally false or misleading, or that the statements appeared in commercial speech or advertising. (Doc. No. 92 at 2). Second, Defendants dispute whether a genuine issue of material fact remains as to whether the alleged deception is material, in that it is likely to influence consumer purchasing decisions. (*Id.*). Third, Defendants argue that any falsity was immaterial, and that Plaintiffs lack evidence to the contrary. (*Id.* at 3). Last, Defendants further allege that Plaintiffs have no evidence that any of the allegedly statements at issue caused harm to Plaintiffs. (*Id.*).[3]

### 1. Falsity of Statements

Plaintiffs have raised a genuine issue of material fact as to whether Defendants statements about Ulma flanges were false. As stated above, Plaintiffs couch their allegations as follows: Defendants misrepresentations appear "in the catalogs, brochures, price lists and websites of third-party distributors of Ulma flanges,"[4] "in the MTRs that accompany each flange," and "by stamping

---

[3] The parties do not dispute whether the manufacture and distributions of their flanges constitute interstate commerce, the fourth element of the test set out in *Pizza Hut*, 227 F.3d 489, 495 and *Derrick*, 2017 WL 3456920, at *5.

[4] Defendants also contend that the representations that appear on third-party websites or in third-party catalogs constitute commercial speech cannot be attributed to Ulma because "it does not have control over the representations made by third-party distributors and there is no evidence in the record demonstrating otherwise." (Doc. No. 92 at 17). Regardless, Plaintiffs have provided evidence (in the form of deposition testimony and photographs of the inscription "A105N" on an Ulma flange) that, at minimum, support a claim of contributory false advertising. *See Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015) ("What, then, must a plaintiff establish in order

A105N" on each flange. (Doc. Nos. 1 at 11–13; 93 Ex. 6, 7). Plaintiffs allege that these representations were (and are) literally false. *See Pizza Hut*, 227 F.3d at 497.[5] Defendants do not dispute that they refer to their flanges as normalized, but instead respond that these representations are not false because their flanges underwent one of two "types of normalization"—Defendants claim to use either the ASTM approved method or their own "proprietary method" to normalize their flanges. (Doc. No. 92 at 9, 10) ("although Ulma did not prior to 2017 apply the ASTM A961 heat treatment to all of its flanges designated as A105N, Ulma has ensured that all of its flanges meet both clients and ASTM A105's mechanical property specifications"); (*See also* Doc. Nos. 92, Ex. 67; 140, Ex. 30).

In support of their arguments, Plaintiffs present evidence in the form of deposition testimony that, at the very least, raises a fact issue concerning whether Ulma's own representatives believe that the "proprietary method" qualifies as normalization:

Deposition of Peio Errasti:

> Q. And you state: We hereby confirm that all flanges in all pressure classes provided to Transam in ASTM, ASME, A/SA105N are normalized in accordance with ASTM A105 and A961; correct?
> A. Correct
> Q. That was not true; correct?
> A. It's – it's writing what he was requesting, but it's not according to – to the reality.

(Doc. No. 122, Ex. 8 at 225–26).

Deposition of Nerea Villar:

> Q. And you do know, as you sit here today, that Ulma didn't heat treat its A105 flanges until late 2017; correct?

---

to state a contributory false advertising claim? First, the plaintiff must show that a third party in fact directly engaged in false advertising that injured the plaintiff. Second, the plaintiff must allege that the defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it.").

[5] "[W]hen the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers . . . In such a circumstance, the court will assume that the statements actually misled consumers."

11

> . . .
> A. Yes. Because when I did this, especially I – I knew that we started doing the filter in the year of – this year and they told me this year you have to put everything is – has gone to normalization Process No. 1 and last year, start putting since July, and we did this – that work. So for that reason I know that.

(Doc. No. 122, Ex. 18 at 124).

Deposition of Jesus Urien:

> Q. If you could write this letter again today, you would not have written it with that sentence about they claim our normalized flanges are not normalized, which is not true? You wouldn't write that sentence today, would you?
> . . .
> A. It's inaccurate, yes.

(Doc. No. 122, Ex. 16 at 109). Plaintiffs argue that this testimony demonstrates that it was "inaccurate" and "not according to [ ] reality" for Defendants to represent that their flanges were normalized. (Doc. No. 114 at 12). Plaintiffs also provide deposition testimony from Iosu Bastida, another Ulma executive, who admits that some of Ulma's MTRs state that the flanges were "normalized at 900 degrees and air cooled," but then admits that this statement is "not accurate." (Bastida Depo. Doc. No. 122, Ex. 3 at 87). Viewing the evidence in the light most favorable to the non-movant—as the Court must do at this summary judgment stage—the Court finds that a genuine issue of material fact remains regarding whether the statement is literally false and/or whether Defendants made a false or misleading statement of fact about their product.

Relatedly, Defendants argue that summary judgment in their favor is proper because Plaintiffs cannot prove that the allegedly false statements constituted commercial speech, as required by the Lanham Act. *See Seven-Up*, 86 F.3d at 1382–83. Plaintiffs allege that

> The "A105N" stamp on each falsely advertised Ulma flange thus acts as a label, assuring the consumer the flange has been normalized. Such "false descriptions of a product, contained in the product's label, share with newspaper advertisements and television and radio commercials the ability to engender consumer confusion

both as to the origin and content of that product.

(Doc. No. 114 at 22) (citing *Warren Corp. v. Goldwert Textile Sales, Inc.*, 581 F. Supp. 897, 900 (S.D.N.Y. 1984)). Defendants respond that none of the insignia stamped on the flanges (or the statements made in the MTRs) constitute commercial speech or advertising under the Lanham Act because the flange (and/or the MTR) is only provided to a customer after purchase. (Doc. No. 92 at 15).

In *Boltex Man. Co., LP v. Galperti*, H-17-1439, 2018 WL 1535199, at **5–6 (S.D. Tex. Mar. 29, 2018), the court denied defendants' motion to dismiss plaintiffs' Lanham Act claims, finding defendants' argument about "post-sale speech" unconvincing. Similar to the present case, plaintiffs alleged that Galperti sold unnormalized flanges, but falsely advertised them as normalized according to ASTM standards by stamping the flanges themselves with A105N and including the A105N label in the MTRs. *Id.* at *1. Galperti argued that "the timing and dissemination of both disqualify either as a commercial statement." *Id.* at *5. In other words, "because the statements were made post-sale, they were not made to influence customers to buy their flanges" and that "because the statements are only seen by the specific customer who has already purchased the product[,] the statements were not disseminated sufficiently to the relevant purchasing public within the carbon steel flange industry." *Id.* The court found that "the stamping and inclusion of MTRs confirm the assumption that consumers make when purchasing the flanges, namely that the flanges are of the quality and specifications that they purport to be." *Id.* at *6.

This Court agrees; the MTRs and the stamps on the flanges constitute commercial speech under the standard set out in *Seven-Up*. *See id.*; *see also Boltex Man. Co., LP v. Galperti*, H-17-1439, 2018 WL 3589084, at *1 n.2 (S.D. Tex. June 12, 2018) (finding summary judgment improper where the defendants again offered the ineffective argument that "[t]he MTRs and the

stamps on the flanges are provided post sale, [they] do not constitute a 'commercial advertisement' under the Lanham Act"). Moreover, Plaintiffs provide evidence that Ulma's customers depend on the MTRs as an accurate reflection of what they purchased, agreeing that an MTR is the metaphorical "birth certificate for a flange." (Smith Depo. Doc. No. 122, Ex. 15 at 140). As such, Defendants are not entitled to summary judgment on this point.

### 2. Capacity to Deceive

Next, Defendants argue that Plaintiffs are unable to establish the second element of a false advertisement claim—whether such statement deceived, or had the capacity to deceive, a substantial segment of potential consumers. Nevertheless, Plaintiffs have demonstrated that a fact issue exists concerning element two, providing evidence that customers sought reassurance from Ulma that their flanges were in fact normalized in accordance with ASTM after the filing of this suit. (Doc. No. 122, Ex. 32 at 2–4). In an email from Rod Lipman (President of Trans Am) to Peio Errasti (Ulma's Quality Director), Lipman wrote:

> As you are no doubt aware, Trans Am has been purchasing A105 flanges in the normalised [sic] condition for all pressure classes, including CL 150 and 300 for more than 30 years. Please refer to our General Purchasing Specification SP-FG-1 Rev. Paragraph 3.6 and 6.2.
>
> In an effort to allay any concerns that may arise from our customers due to rumours [sic] as a result of the Boltex/ Weldbend action, I am asking our manufacturers to provide a statement from your quality department on your company letterhead that will certify that all flanges in all pressure classes, including CL 150 and CL300, provided to Trans Am in ASTM/ASME A/SA 105N are in fact normalized in accordance with ASTM A 105 and A961.
>
> Your cooperation in this matter is appreciated.
>
> Best regards,
> Rod

(*Id.* at 2). In response, Errasti sent:

> Dear Mr Lipman
>
> We hereby confirm that all flanges, in all pressure classes, provided to TRANS AM in ASTM/ASME A/SA1 OSN are normalised [sic] in accordance with ASTM A105 and A961.
>
> Should you require additional information, please feel free to contact me.
>
> Mr Pelo Errasti
> Quality Director
> ULMA Piping

(*Id.* at 4). Plaintiffs offer this email exchange and letter as evidence that Defendants' statements about their normalization processes may have deceived, or had the capacity to deceive, a substantial segment of potential consumers. In other words, customers' requests for reassurances could indicate to a reasonable juror that customers associated the "A105N" stamp with the ASTM normalization process specifically, rather than associating it with both the ASTM process *and* Ulma's proprietary method.

### 3. Materiality

Defendants also dispute Plaintiffs' ability to succeed on element three, whether the alleged misrepresentation was material. Defendants argue that the strict adherence to the standard ASTM normalization process is not relevant, so long as the method used to treat the flange results in the same strength in the steel. (*See* Doc. No. 92 at 2). Regardless, as the Court described above, Plaintiffs have provided evidence that ASTM-compliant normalization is an important standard upon which customers rely. Plaintiffs have also provided evidence that raises a fact issue concerning whether the alleged misrepresentation influenced purchasing decisions; that is, whether customers would have continued to purchase flanges from Ulma had they realized that the flanges were treated using Ulma's "proprietary method" rather than the method set out by

15

ASTM.[6] Thus, Plaintiffs have demonstrated a fact issue as to this element.

### 4. Interstate Commerce

As mentioned above, the parties do not dispute the interstate commerce element of the test set out in *Pizza Hut*, 227 F.3d 489, 495 and *Derrick*, 2017 WL 3456920, at *5.

### 5. Injury

While the Court considers the evidence to be very thin, Plaintiffs have demonstrated that a fact issue remains concerning element five, injury. To prove injury, Plaintiffs must provide evidence that a consumer would have bought Plaintiffs' products instead of Defendants' but for the misleading statements. *See IQ Prods.*, 305 F.3d at 376. Defendants argue that Plaintiffs are unable to prove causation. Plaintiffs respond that Ulma specifically lists Boltex's prices when responding to Requests for Quotes ("RFQs"). Plaintiffs appear to claim that Defendants engaged in comparative advertising; however, they fail to provide (or at least fail to cite to the specific place in the record demonstrating) evidence of comparative advertising. (Doc. No. 114 at 32). *See Healthpoint Ltd. v. Stratus Pharm., Inc.*, 273 F. Supp. 2d 871, 885 (W.D. Tex. 2001) (explaining that federal courts have held that injury should be presumed when a Lanham Act claim involves false or misleading comparative advertisements).[7]

---

[6] *See* Smith Depo., Doc. No. 122, Ex. 15 at 44
    Q. Okay. And when you say that a—a flange or another component that you purchase needs to meet the spec, what do you mean by that?
    A. The spec has certain requirements, whether it's the metallurgy or the dimensions or possibly even some of the processes, it has to meet those to able to be -- to carry the ASTM requirement.
    Q. If a flange is marked as meeting ASTM A105, for example, but it does not meet ASTM A105, would Ferguson sell that flange to a customer?
    A. No, sir.
    Q. If Ferguson knew that a flange marked ASTM A105 did not meet ASTM A105, would it purchase that flange from the vendor?
    A. No, sir.

[7] *See also Greater Houston Transp. Co. v. Uber Tech., Inc.*, 155 F. Supp. 3d 670, 703–04 (S.D. Tex. 2015)
    Federal Courts have routinely held that injury should be presumed when a Lanham Act claim involves false or misleading comparative advertisements. *Healthpoint Ltd. v. Stratus Pharm., Inc.*, 273 F. Supp. 2d 871, 885 (W.D. Tex. 2001); *Time Warner Cable, Inc. v. DIRECTTV, Inc.*, 497 F.3d

Plaintiffs' failure to demonstrate that Defendants engaged in comparative advertising is not fatal to their claim. Plaintiffs have provided some evidence that at least one of Defendants' customers in fact compared Boltex and Ulma flange prices. (Raban Depo. Doc. No. 122, Ex. 14 at 34, 117) (Question: [If] Ulma did not normalize its flanges and you knew that, you would no longer purchase allegedly normalized flanges from them, would you?" Answer: "[I]f a manufacturer was knowingly not normalizing flanges and saying that they were then that would impact our purchase decision, yes." Question: "And it is typical to compare the pricing of Boltex and Ulma flanges?" Answer: "Yes."). Although not very compelling, this testimony raises at least a question of fact with regard to causation and injury. Since a fact issue remains regarding whether Ulma's alleged false advertising caused customers to order from Ulma instead of Boltex, summary judgment is denied.

### C. Res Judicata and Judicial Estoppel

Defendants also argue that Plaintiffs' claims are barred by *res judicata* and judicial estoppel based on Boltex's success before the International Trade Commission ("ITC"). (Doc. No. 92 at 34–35).[8] *Res judicata*, also known as claim preclusion, "is the extinguishment of a claim by a prior final judgment by a competent court and bars relitigating any matter offered to sustain or defeat a

---

144 (2nd Cir. 2007); *Porous Media Corporation v. Pall Corporation* 110 F.3d 1329 (8th Cir. 1997); *McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d 34 (2nd Cir. 1988). Because the Court has found that the question of the literal falsity or allegedly misleading nature of Uber's representations is a question of fact to be determined at trial, Plaintiffs' argument about whether injury should be presumed should be addressed after the trier of fact addresses that threshold question. The determinations of the trier of fact regarding the nature of Uber's statements directly impact the presumption of injury question. Therefore, the Court finds that there are genuine issues of material fact remaining regarding injury on the basis of Uber's statements. *See IQ Prods.*, 305 F.3d at 376.

[8] "In that proceeding, Plaintiffs claimed they were 'increasingly losing sales to unfairly-priced imported carbon steel flanges–based on price, and on price alone' and that '[p]roducers of flanges in the subject countries have both substantial capacity and substantial excess capacity . . . [to] allow them to increase exports to the United States even further. Plaintiffs prevailed before the ITC, resulting in substantial duties on finished carbon steel flanges from Spain, Italy, and India." (Doc. No. 92 at 35).

claim in a previous action." *Nevada v. United States*, 463 U.S. 110, 130–31 (1983). In *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 421–22 (1966), the Supreme Court observed that "[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." The implication in this statement is that if the administrative proceeding has not been of an adjudicative nature, a decision arrived at by the administrative agency cannot have *res judicata* effect. *See id.* Thus, an ITC determination is conclusive in a subsequent action between the same parties only when an "issue of fact or law is actually litigated and determined by a valid and final judgment." *Block v. U.S. Intern. Trade Comm'n*, 777 F.2d 1568, 1571 (Fed. Cir. 1985).

Boltex's Lanham Act claim was not "actually litigated" before the ITC. *See id.* In the present case, Boltex alleges that Ulma has violated § 43(a) of the Lanham Act by falsely representing that Ulma flanges were normalized according to ASTM standards. Before the ITC, Boltex was a petitioner alleging that Ulma had violated the Tariff Act by selling flanges at less than fair value. Boltex does not attempt to "relitigate" the Tariff Act action decided by the ITC here (to be sure, the Tariff Act does not offer a private right of action),[9] nor did Boltex litigate the Lanham Act claim in the previous forum. As such, the doctrine of *res judicata* is inapplicable here.

The doctrine of judicial estoppel prevents parties from "asserting a position in a legal proceeding that is contrary to a position previously taken" in either the same or an earlier proceeding. *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (quoting *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996)). Two bases of judicial estoppel must be satisfied before applying the doctrine. *Hall*, 327 F.3d at 396. The doctrine may be applied only

---

[9] 19 U.S.C. §1673(b)

where (1) "the position of the party to be estopped is clearly inconsistent with its previous one" and (2) that party has "convinced the court to accept that previous position." *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 833 (5th Cir. 2000).

Judicial estoppel is also inappropriate here. The Court does not find it to be the case that "Plaintiffs' legal positions before the ITC and this Court are plainly inconsistent." (Doc. No. 92 at 35). Defendants argue that Plaintiffs' claim before the ITC (that Ulma sold flanges in the U.S. at "less than fair value") is inconsistent with their current claim (that Ulma misrepresents whether their flanges are normalized). As a matter of law, this is incorrect. According to Boltex, Ulma's non-normalization of their flanges explains the price variance between Ulma and Boltex flanges: If Ulma does not normalize its flanges—an endeavor that requires more time, equipment, and resources—Ulma would be able to sell its flanges at a cheaper price. Since Boltex's legal positions are not inconsistent, the Court declines to apply the doctrine of judicial estoppel.

### D. Common Law Unfair Competition Claim

Defendants next move for summary judgment on Plaintiffs' Texas common law claim of unfair competition. (Doc. No. 92 at 33–34). "Unfair competition under Texas law is the umbrella for all statutory and non[-]statutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000). Liability for unfair competition must be premised on some "independent substantive tort or other illegal conduct." *Schoellkopf v. Pledger*, 778 S.W.2d 897, 904–05 (Tex. App.—Dallas 1989, writ denied). "Although the illegal act need not necessarily violate criminal law, it must at least be an independent tort." *Taylor Pub.*, 216 F.3d at 486. "Courts in the Fifth Circuit generally analyze a Lanham Act deceptive advertising claim and a Texas unfair competition claim together." *Tercel Oilfield Prods. USA LLC v. Alaskan Energy Resources, Inc.*,

H-13-3139, 2014 WL 645380, at *4 (S.D. Tex. Feb. 19, 2014). Since the Court has found that summary judgment is improper for Plaintiffs' Lanham Act claim based upon this same evidence, Defendants' Motion for Summary Judgment on Plaintiffs' unfair competition claim must also be denied. *Celotex*, 477U.S. at 325; *Schoellkopf*, 778 S.W.2d at 904–05.

## IV. Conclusion

For the foregoing reasons, the Court finds that summary judgment in favor of Defendants is improper. Plaintiffs have demonstrated that a genuine issue of material fact remains as to each factor of their prima facie case. Defendants' Motion for Summary Judgment is **DENIED**.

It is so ordered.

Signed at Houston, Texas, this 28th day of June, 2019.

Andrew S. Hanen
United States District Judge