**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BOLTEX MANUFACTURING COMPANY, L.P., *et al.*, *Plaintiffs*, | § § § § | |
| v. | § § | CIVIL ACTION NO. 4:17-CV-01400 |
| ULMA PIPING USA CORP., *et al.*, *Defendants*. | § § § | |

## ORDER

On September 27, 2019, the jury found in favor of Plaintiffs, Boltex Manufacturing Company, L.P. ("Boltex") and Weldbend Corporation ("Weldbend"), on all issues. Due to the contested nature of several issues, the Court issued an interlocutory order, pursuant to the findings of the jury, in favor of Plaintiffs as a precursor to entering a final judgment. Plaintiffs filed a motion seeking reconsideration of various aspects of that order. (Doc. No. 342). Defendants responded. (Doc. No. 353). Plaintiffs replied. (Doc. No. 357). The Court held a hearing on the matter and now issues a final order.

### I.      Statement of Facts

This case arises from allegations (subsequently confirmed by jury findings) that Defendants Ulma Forja, S. Coop ("Ulma Forja") and Ulma Piping USA Corp. ("Ulma USA") (collectively "Defendants" or "Ulma Piping") falsely advertised their carbon steel flanges as being normalized and/or in compliance with ASTM A105, A961, and A941.

#### A.  Plaintiffs, Defendants, and the Market for Carbon Steel Flanges

Plaintiffs Boltex and Weldbend are manufacturers of forged flanges primarily for the oil and gas, petrochemical, transmission, engineering, and construction industries, located in Houston, Texas and Argo, Illinois, respectively. Defendant Ulma Forja is a Spanish company that

manufactures and sells forged flanges for the oil and gas, petrochemical, transmission, engineering, and construction industries. Defendant Ulma USA acts as Ulma Forja's North American representative and sales agent.[1] Plaintiffs and Defendants offer for sale, sell, and/or distribute carbon steel flanges. Carbon steel flanges are critical components used in oil and gas pipelines, among many applications. The flanges are used to connect pipes to other pipes, valves, and fittings used in oil and gas pipelines.

ASTM International (formerly, the American Society for Testing and Materials) or ASTM, is an international organization that sets standards for, among other things, forged carbon steel flanges. One purpose of ASTM standards is to protect the public by requiring testing and requiring that components be manufactured by certain processes in order to reach a level of performance and safety standards. Another is to provide uniform standards of quality for those purchasing and using flanges. ASTM Standard A105 covers forged carbon steel piping components, including flanges for ambient- and higher-temperatures services in pressure systems. Under ASTM Standard A105, heat treatment is mandatory for carbon steel flanges above Class 300.

Among the heat treatment measures permissible under ASTM A105 is "normalization." ASTM standards A961 and A941 define "normalizing" as a separate heat treatment process that takes place after forging but before machining, wherein material is placed in a furnace and uniformly reheated to a temperature above the transformation range and subsequently cooled in air at room temperature to achieve grain refinement and improved homogenization. Normalizing a carbon steel flange improves the physical properties of the flange. Normalizing generally produces a more refined grain structure in the steel. Improving the physical properties of flanges

---

[1] At trial, the Ulma Defendants stipulated that for verdict purposes the two separate Ulma entities could be treated as one.

through normalization is important, as flanges can be used in extreme high-temperature, high-pressure, corrosive environments.

Manufacturers identify carbon steel flanges that comply with ASTM A105 standards and that have been normalized by marking (engraving) the flanges with "A105N." Some manufacturers label normalized flanges with an "N." Flanges that are marked "A105N" must be normalized in accordance with ASTM standards. Customers expect that A105 flanges that are required to be normalized or that are marked as normalized will be normalized according to ASTM standards A961 and A941. Many customers would not purchase a flange advertised as "A105N" or "normalized" if they knew it had not actually been heat treated. Customers who receive a flange marked as "A105N" have no easy, non-destructive, means of verifying whether or not the flange was actually heat treated. Instead, customers must rely on the manufacturers' representations that their flanges are normalized.

Not all ASTM A105N flanges or flange manufacturers are created equally. One of the most disputed issues at trial was whether Ulma Piping competed with Plaintiffs. The arguments hinged primarily on the interchangeability of domestic and foreign flanges. While both Plaintiffs are domestic manufacturers of flanges, Ulma Piping only sells foreign-made flanges. (Obviously Ulma Forja only makes foreign flanges as its only manufacturing facility is located in Spain). At trial, the weight of the evidence suggested that domestic flanges are considered by some to be superior to foreign flanges and command a price premium. Indeed, testimony suggested that certain companies would not accept foreign flanges and that distributors would therefore stock foreign and domestic flanges separately so as not to commingle the flanges—in order to comply with the domestic-only orders. Other consumers do not care about a flange's origin and still others prefer foreign made. In his testimony, F.T. Graff, a purchaser at MRC Global, stated that if his company had to replace the stock sold by a foreign flange manufacturer, it would turn to another

foreign (as opposed to domestic) manufacturer if he could comply with his customer's needs—due to price. In line with this evidence, Defendants argued that they did not compete with Plaintiffs, and thus Plaintiffs were not harmed by Defendants' alleged (and since proven) false advertising. Plaintiffs contested this point, noting that many buyers—including pipeline companies—would accept both foreign and domestic flanges interchangeably for many jobs. Further, Plaintiffs claim that Defendants were able to undercut Plaintiffs on price for these jobs because they were selling products claiming that they were either ASTM A105N compliant or otherwise normalized when in fact they were not, allowing the Defendants to dodge the additional cost of normalizing their flanges. Despite these claims, Plaintiffs and their own experts conceded that they were not true head to head competitors with Defendants in all markets.

In line with Plaintiff's theory, Plaintiffs' damages expert, Thomas Britven, calculated damages by determining the hypothetical share of the market that Plaintiffs would have occupied if Defendants were no longer market participants. To reach this number, Britven calculated the share of the market Plaintiffs currently occupy and extrapolated it to cover the portion vacated by Defendants' hypothetical departure. On the other hand, Defendants' damages expert, Thomas Varner, argued that there was no overlap between the two markets and no damages should be found. In one of the most telling segments of testimony, Varner testified that the overlap in customers between Defendants and Plaintiffs was minimal, showing the virtual lack of sales made by Plaintiffs to Defendants' top five customers. On cross-examination, Plaintiffs' counsel showed expanded numbers that indicated competition between the Plaintiffs and Defendants once one considered Ulma's top ten customers. While the overlap between the sales of Plaintiffs and Defendants was undoubtedly evident when expanded to consider more customers, the overlap overall remained somewhat small. This was to be expected considering the evidence showed that Defendants' top five customers made up almost 85% of their sales.

The jury's verdict, which was supported by an abundance of evidence, strongly suggested that they believed a middle ground was more appropriate. The jury awarded a total of $650,000 in damages to Boltex for the six years covered by the lawsuit, and $300,000 in damages to Weldbend. Both were a far cry from the $7,000,000 sought by Boltex and the $10,500,000 sought by Weldbend and far from the zero-damage figure sought by Defendants. The jury's verdict clearly rejected Defendants' argument that they should not be held liable at all because Plaintiffs could not prove the competitive injury necessary to sustain a claim under the Lanham Act. In consideration of both sides' arguments, the evidence adduced at trial, and the jury's verdict, the Court finds that some competition exists between Plaintiffs and Defendants, but, like the jury's finding, that it was certainly not at the level alleged by Plaintiffs.[2]

## B. Defendants' False Advertising

Ulma Piping advertised the relevant carbon steel A105 flanges it produced and sold into the United States as normalized and compliant with ASTM A105. They did so in multiple ways: (a) brochures and presentations they provided to actual and potential customers; (b) email communications to actual and potential customers; (c) responses to customer requests for quote; (d) engravings (markings) on the flanges themselves; (e) signed certificates of inspection, and (f) Mill Test Reports ("MTRs"). During the relevant time period, at least 95% of the flanges Ulma advertised and sold into the United States which purported to be normalized and ASTM-compliant were not normalized in compliance with the ASTM standards. Thus, most of their advertising was false. At trial, Ulma Piping argued that while the flanges were not normalized pursuant to the ASTM standards, they were nevertheless normalized using Ulma Piping's "in-line normalization

---

[2] Indeed, in a sister case filed against a different defendant, another court actually granted summary judgment for the defendants due to a failure by Plaintiffs to show that they had been injured as a result of the alleged false advertisements. *See Boltex Manuf. Co., LP v. Galperti, Inc.*, H-17-1439, 2019 WL 2568338 (S.D. Tex. June 21, 2019).

process." While noting that "in-line normalization," if it is indeed normalization, is not consistent with ASTM standards, the Court expresses no opinion as to the chemical soundness of this process. Instead, it reiterates that Ulma never normalized their flanges in the manner required by the ASTM standards, despite the fact that they advertised that their flanges complied with these standards.

### C. Ulma's Response to the Present Suit

This suit was filed by Plaintiffs on May 5, 2017 alleging claims for false advertising under the Lanham Act and Texas common law unfair competition. Following the filing of the lawsuit, Defendants defended the action here in this Court. In the same month the suit was filed, Ulma sent a letter to its customers accusing Plaintiffs of lying about the mislabeling and reiterating that they did normalize their flanges in compliance with ASTM standards. Ulma continued to market and sell non-normalized flanges as "normalized" and "A105N" to its customers in 2018 and 2019. Finally, in late 2018 or early 2019, Ulma Piping began admitting to its customers that it used two processes—ASTM normalization and what it termed "in-line normalization."

At trial, Iosu Bastida, the sales director of Ulma USA, acknowledged that the 2017 letter was incorrect and that Ulma Piping knew that it was not normalizing its flanges consistent with the ASTM standards when it sent the letter refuting the allegations in this suit and accusing Plaintiffs of lying. When pressed as to why the company made these false statements when confronted with the lawsuit, Bastida could only say that Defendants "should have been more accurate." These facts clearly influenced the jury with regard to their award of punitive damages and finding that disgorgement was appropriate. This Court, too, finds such conduct to weigh heavily on the first *Pebble Beach* factor discussed below.

### D. The Jury Verdict

Following an eight-day trial, the jury returned a unanimous verdict in favor of the Plaintiffs. The verdict found Ulma Forja and Ulma Piping liable to both Boltex and Weldbend for: (a) false

advertising under the Lanham Act; (b) unfair competition under the Lanham Act; and (c) unfair competition under Texas common law. The jury found that Boltex had lost profits of $250,000.00 from May 5, 2013 to May 4, 2015 and $400,000.00 from May 5, 2015 to May 31, 2019 and that Weldbend had lost profits of $100,000.00 from May 5, 2013 to May 4, 2015 and $200,000.00 from May 5, 2015 to May 31, 2019. The jury also found based upon Plaintiffs' Texas state law claims that the actions by Defendants warranted exemplary damages, awarding $2,000,000.00 to each Plaintiff. Finally, the jury found that disgorgement was appropriate and found that Ulma Piping gained $26,000,000.00 from its false advertising and unfair competition from May 5, 2013 to May 31, 2019. The Court finds that the jury's behavior was in fact model behavior and their dedication to their civic duty commendable, especially when one considers that they served during a lingering tropical storm. More importantly for this order, the Court finds their results to be sound and quite supportable by the evidence.

## II.    The Court's Prior Order

Following the trial, Plaintiffs filed a motion for judgment seeking confirmation of the award, as well as attorney's fees. Upon consideration of the parties' arguments, the Court took the unusual step of issuing an interlocutory order. Due to the variety of issues and the fact that some issues in this case were for the jury while others (disgorgement, for example) were for the Court,[3] the Court issued its order as a means of focusing the parties on the most pertinent questions prior to entering an actual judgment. In summary, the order concluded: (1) that a four-year statute

---

[3] At one point, Plaintiffs argued that they had a Seventh Amendment right to have the jury consider disgorgement. At least two Circuits have considered this issue and have held that a party does not a Seventh Amendment right to a jury trial on the Lanham Act's equitable remedy of disgorgement. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343 (11th Cir. 2019); *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074–76 (9th Cir. 2015). The Court agreed with those opinions that there is no Seventh Amendment right to a jury trial on the Lanham Act's disgorgement remedy but nevertheless submitted the issue to the jury on an advisory basis.

of limitations was most appropriate for Plaintiffs' Lanham Act claims; (2) that Texas state law required the Court to trim Plaintiffs' exemplary damages; (3) that Plaintiffs must elect to recover under either the Lanham Act or Texas common law; (4) that disgorgement of profits was proper; (5) that the jury's award of disgorgement exceeded the amount necessary to achieve equity between the parties and thus should be decreased; and (6) that this case was not exceptional and as such did not require an awarding of attorney's fees. The Court's order also requested Plaintiffs submit a bill of costs to the Court, and, in a separate order, the Court requested Plaintiffs submit proposed injunctive language.

Unsurprisingly, the Plaintiffs filed a motion for reconsideration (Doc. No. 342). In that motion, Plaintiffs contend that the Court erred in: (1) decreasing what they considered to be their disgorgement award; and (2) finding that this was not an exceptional case, which had the effect of negating an attorney's fees award. In a subsequent letter brief to the Court, the Plaintiffs further argued that the Court should permit Plaintiffs to make an election that encompasses not only lost profits and disgorgement under the Lanham Act, but also Texas common law exemplary damages. Plaintiffs also filed a bill of costs and submitted a proposed injunction. Defendants responded to each of these arguments and Plaintiffs replied. With the exception of the proposed injunction, which will be addressed in a separate order, the Court will take up these issues here.[4]

## III. Discussion

### A. Whether the Disgorgement is Proper and What Amount Should Be Awarded

Before discussing any disgorgement award, the Court notes that in its interlocutory order, it found that disgorgement was a proper award without addressing the factors laid out by the Fifth

---

[4] The parties have not asked the Court to reconsider certain matters, like the statute of limitations applicable to the Lanham Act. The Court will not address those arguments in this order, but it nevertheless notes that the parties have sufficiently briefed those issues such that their objections have been reserved on appeal.

Circuit in *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001).[5] Following a finding of liability, a prevailing Lanham Act plaintiff is entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). In *Pebble Beach*, the Fifth Circuit held that in considering whether disgorgement is appropriate as a matter of equity, a court should consider:

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

*Id.* at 554. "The *Pebble Beach* factors are non-mandatory and non-exclusive: the district court is free to consider other facts in assessing whether disgorgement of profits would be equitable, just as it may exercise discretion in weighing the individual factors." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 876 (5th Cir. 2019). The Court instructed the jury on these factors, and the jury made a finding that disgorgement was appropriate. Considering the facts of the case, the Court agrees with that finding. Obviously, factor (6) does not apply. The Court notes that factors (1) and (5) are particularly salient here and universally weigh in the Plaintiffs' favor. The facts adduced at trial show (and the Court so finds) that Defendants intended to deceive customers by mislabeling the flanges and that they continued to do so after 2017, when this action was filed. Further, the public interest is significantly served here for a few reasons. First, as discussed above, determining whether carbon steel flanges went through a heat treatment process cannot be determined without a test that destroys the actual product. Therefore, false advertising in this industry is difficult to detect. Consequently, the buyers of the flanges must rely on the labeling.

---

[5] The Court had the jury consider the issues concerning disgorgement in an advisory context and the results are detailed in the text. When doing this, the Court gave jury instructions which mandated they consider the *Pebble Beach* factors.

Second, the false advertising here relates to the integrity of pipelines carrying oil and gas. Should a flange crack, it could result in leaks that severely harm the environment or cause damage to life or property. While the evidence was not as overwhelming, the Court also finds that Defendants' diverted sales from both Plaintiffs. The Court further finds that Plaintiffs had no remedy for this misconduct as there was no other legal means to stop Defendants other than to file this suit, and that even the pursuit of this action did not dissuade the Defendants, considering they sent out the 2017 letter again falsely advertising that their products were ASTM compliant. Finally, while this conduct had been ongoing for some time, the Plaintiffs moved promptly once they could confirm the misconduct by testing Defendants' products. As such, the Court finds, as did the jury, that disgorgement is necessary and proper here.

The Lanham Act commits the calculation of this equitable award to the discretion of the district court. *See* 15 U.S.C. § 1117(a) ("The court shall assess such profits and damages or cause the same to be assessed under its direction."). "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." *Id.* Consistent with this, the Fifth Circuit provides district courts "great latitude to determine the nature of the infringing conduct and its adverse effects, if any, on the plaintiff, and to fashion relief accordingly." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 874–75 (5th Cir. 2019) (internal citations, quotations, and alterations omitted). In fashioning this relief, this Court is wary that, in cases involving competitors, often "over-compensation may result if plaintiff seeks both damages for lost profits on sales diverted to the infringer and the profits made on those sales by the infringer." 5 McCarthy on Trademarks and Unfair Competition § 30:73 (5th ed. 2019).

In its interlocutory order, the Court discussed its concern that it would not be appropriate to award Boltex and Weldbend the entirety of the profit amount that the jury found was derived from the false advertising. The Court stated that to do so would provide Plaintiffs with a windfall. Instead, the Court applied the testimony of the Plaintiffs' own expert and awarded each a percentage of Ulma Piping's profit that was commensurate with their respective market shares.[6] For Boltex, who held a 11.6% market share, the Court found $3,016,000.00 in disgorgement to be added to their own lost profits and costs. For Weldbend, who held a 10.4% market share, the Court found $2,704,000.00 in disgorgement to be added to their own lost profits and costs.

As mentioned above, Plaintiffs objected to the Court's action in reducing what they felt their award should be by close to $20,000,000, and they sought reconsideration. In support, Plaintiffs cite to a plethora of cases holding that a court may award disgorgement even where a diversion of sales is not shown. Further, Plaintiffs argue that, even if there were a windfall in this case, it would be inequitable for the windfall to go to the Defendants who engaged in improper false advertising. In response, Defendants contend that the cases Plaintiffs cite are distinguishable because they are disgorgement awards resulting from trademark infringement, not unfair competition/false advertising. Additionally, Defendants suggest that to impose a greater disgorgement award would amount to a penalty and that equity weighs against increasing disgorgement.

---

[6] While there is supporting trial testimony, the Court here references below Ulma's earlier Motion to Exclude the testimony of Mr. Britven as it most succinctly sets out Mr. Britven's process for calculating market share:

> To calculate damages using the market-share approach, Britven first calculated the current percentage of sales (i.e., "market share") each Plaintiff and Ulma made in the total U.S. flange market. He then created a but-for scenario where Ulma did not commit the alleged offense in question—namely, the alleged false advertising of normalization. In this but-for scenario, Britven assumes that the Ulma's share of the market would be divided up among the remaining market participants, with the Plaintiffs receiving sales according to their market share.

(Doc. No. 95 at 14).

The Court finds that it properly weighed the equitable considerations and will thus not adjust its prior order. The cases Plaintiffs cite do not run counter to the Court's interlocutory order. Rather, the Court believes these cases are emblematic of why equity here demands a decrease in the profits the jury found were attributable to Defendants' false advertising. After reviewing the cases, the Court notes (as the Defendants did) that most, if not all, are in the context of trademark infringement. In trademark infringement cases, there is only one party that has been injured—the owner of the trademark. Where a trademark infringer enters into a market within the penumbra of a trademark holder's business, but that the holder has not yet entered, there may be an injury without any actual lost sales. In those situations, disgorgement is necessary to remedy the harm that will not be covered by an award of lost profits. Further, awarding all of the disgorged profits to the trademark owner is not a windfall as the owner is the only one damaged (setting aside the theoretical damages to consumers).

The same cannot be said of this false advertising case, where the harm the Lanham Act addresses is one shared by all competitors in the market—the encroachment on the ability to compete in a fair market. In these cases, a disgorgement award shared between *all* competitors in the market may serve the Lanham Act's purpose of "achiev[ing] equity *between or among the parties*." *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 369 (5th Cir. 2000) (emphasis added). That is not the case here. The Court has only two of the many flange competitors before it. What's more, these two companies were not—in the eyes of the jury—major competitors of Ulma Piping in the overall flange market. The Court likewise finds that view reasonable and that the evidence supports that Plaintiffs and Defendants were not major head to head competitors. In the disgorgement damage question, the jury was asked to find the total amount of profits Ulma derived from its misconduct, not an appropriate number to award Plaintiffs. The Court finds that profit figure to be both reasonable and supported by the evidence, and the Court adopts the same. This

profit, however, was gained at the expense of all competitors in the flange marketplace, not just the Plaintiffs. The Court hereby adjusts the award to Plaintiffs herein to be consistent with the market shares of the entire carbon steel flange market as found by Plaintiffs' own expert. The Court finds that this award "achieves equity between or among" the Defendants who manufacture foreign flanges and the Plaintiffs who manufacture domestic flanges. *Id.* For these reasons, Plaintiffs' motion to reconsider the disgorgement segment of the prior order is denied.

### B. Whether a Finding of Exceptional Case is Proper

Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. 1117(a). In the Fifth Circuit, a case is "exceptional" if "(1) in considering both governing law and the facts of the case, the case stands out from others with respect to the substantive strength of a party's litigating position; or (2) the unsuccessful party has litigated the case in an 'unreasonable manner.'" *Baker v. DeShong*, 821 F.3d 620, 625 (5th Cir. 2016). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). In its interlocutory order, the Court concluded that this case was not exceptional and thus did not merit an award of attorney's fees. The Court stated that it did not believe the case stood out due to the substantive strength of either side's litigating position considering the closely contested nature of whether Plaintiffs suffered any injury due to the acts of Defendants. Indeed, the Court noted that Plaintiffs' lost profits damages were found to be significantly lower than those requested at trial and that in a sister case filed against a different defendant, another court (obviously with a different record) actually granted summary judgment for the defendants due to a failure by Plaintiffs to show that they had been injured as a result of the alleged false advertisements. *See Boltex Manuf. Co., LP v. Galperti, Inc.*, H-17-1439, 2019 WL 2568338 (S.D. Tex. June 21, 2019).

Plaintiffs sought reconsideration arguing that if this case is not exceptional, then no case would be. Namely, Plaintiffs argued that Defendants' Lanham Act violations were intentional and that they failed to stop falsely advertising their products even after Plaintiffs' suit was filed.[7] Interestingly, Plaintiffs relegated the portion of their brief addressing the main rationale underlying the Court's interlocutory order to a footnote. That footnote argued that Defendants were unreasonable in how they litigated the competition aspect of the case because of an International Trade Commission report that found Plaintiffs and Defendant directly competed and an internal Ulma document stating that the companies competed. Further, the footnote argued that direct competition is not necessary to support a finding of liability under the Lanham Act.

The Court still does not find this case to be exceptional. In the previous order, the Court noted that the claims of injury were closely disputed. In fact, this Court had given close consideration to Defendants' motion for summary judgment on that point. In its order considering that motion, the Court noted that Plaintiffs' evidence of injury was "very thin" and "not very compelling" but nonetheless denied the motion because there was enough evidence to raise an issue of material fact. (Doc. No. 189 at 17). That observation was borne out at trial. The Court does not find the applicable law to be unique, nor does it find the factual disputes, although hotly contested, to be exceptional. While the Court agrees that the conduct of the Defendants in continuing to market its products in a false manner was certainly unbecoming corporate behavior, those actions are no doubt why the jury awarded punitive damages and found disgorgement to be appropriate, and it is why this Court agrees with the jury. Nevertheless, this misconduct by a party does not make this case unique nor do the legal or factual issues. Indeed, while the jury found the

---

[7] While the cases Plaintiffs cite provide instances of where courts have awarded attorney's fees, the Court is not bound by them. Instead, the Court "may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness, LLC*, 134 S. Ct. at 1756.

Defendants to be liable, they clearly did not wholeheartedly disagree with the Defendants' positions concerning Plaintiffs' damages. They actually cut the requested damages by 95%.

## C. Whether Plaintiffs May Recover Costs

Following a finding of liability, a prevailing Lanham Act plaintiff is entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). The Court finds the Plaintiffs are due their costs. In the interlocutory order, the Court requested Plaintiffs submit to the Court a bill of costs. (Doc. No. 377 at 5). Plaintiffs each submitted such bills. Plaintiff Boltex requested $61,549.74 in costs and $7,522.73 in witness fees for a total of $69,072.47, (Doc. No. 347), while Plaintiff Weldbend requested $62,361.43 in costs and $7,638.73 in witness fees for a total of $70,000.16. (Doc. No. 348). Defendants objected to various costs. *See* (Doc. No. 352). In response, Plaintiffs withdrew the request for translation costs of $10,842.29. (Doc. No. 360 at 2). Eight remaining objections must be dealt with. Broadly, under 28 U.S.C. § 1920, taxable court costs include:

> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title; and
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

### 1. Whether Plaintiffs are Entitled to the Cost of Video-Taped Depositions

Defendants contend that Plaintiffs are not entitled to recoup the costs of videotaping the depositions of witnesses that would appear at trial. Plaintiffs argue that video depositions have been permitted where they are shown to be necessary for use in the case and contends that the

video depositions were used for the purposes of impeachment. Further, Plaintiffs contend that the complexity of this case demanded the use of video depositions, arguing that Defendants made use of deposition transcripts in their motions for summary judgment. "[V]ideo deposition costs are considered recoverable if they are 'shown to be necessary for use in the case under § 1920(2).'" *Gaspari v. FMC Techs., Inc.*, No. CV H-13 2353, 2016 WL 2659593, at *2 (S.D. Tex. May 5, 2016). Considering the complexity of the subject matter, the various locations of the witnesses, and the length of the case, the Court considers the videotaping of the depositions to be recoverable as necessary for use in this case. Defendants' objections are overruled.

### 2. Whether Plaintiffs May Recover for the Costs of a Private Process Server

Defendants contend that Plaintiffs may not recover the $119.25 cost for the price of a private process server to serve Industrial Valco. Plaintiffs put forward evidence that using the U.S. Marshals to serve Industrial Valco would have cost $110. Typically, "absent exceptional circumstances, the costs of a private process server are not recoverable under Section 1920." *Baisden v. I'm Ready Prods., Inc.*, 793 F. Supp. 2d 970, 974–975 (S.D. Tex. 2011). Despite the *de minimis* difference between the two costs the Court sustains the objection and will adjust the award to reflect the $9.25 difference between the costs.

### 3. Whether Plaintiffs May Recover for the Costs of Certain Hearing Transcripts

Defendants argue that Plaintiffs should not be permitted to recover the costs of hearing transcripts because they fail to explain why they were necessary for use in this case. Plaintiffs respond that the use of these transcripts—which included the transcript of the Court's first of two long pre-trial hearings—was necessary to keep track of the multiple evidentiary issues which were either decided or deferred at that hearing. Considering the complexity of the trial and the hundreds of rulings that the Court made at those hearings, the Court overrules Defendants' objections.

### 4. Whether Plaintiffs May Recover for the Costs Related to Depositions

Defendants argue that Plaintiffs should not be permitted to recover the costs related to depositions in this case, namely (by the Court's reading of the Plaintiff's spreadsheet) the printing of exhibits for depositions. The Court considers these expenses to be legitimate costs under Section 1920(3) and overrules Defendants' objections.

### 5. Whether Plaintiffs May Recover for the Costs Related to Their Trial Demonstratives

Defendants argue that Plaintiffs should not be permitted to recover the costs of their trial demonstratives because Plaintiffs did not obtain court approval. Defendants argue that the Court provided approval when Defendants counsel asked if their side could use PowerPoint presentations. "In the Fifth Circuit, expenses for the production of various types of non-testimonial evidence—such as photographs, maps, charts, graphs, and other demonstrative aids—are taxable as costs provided the prevailing party obtained court approval before incurring the expense." *Two–Way Media, LLC v. AT&T Servs., Inc.*, No. SA-09-CA-00476-OLG, 2013 WL 12090356, at *5 (W.D. Tex. Nov. 22, 2013). The Court believes that it implicitly gave its approval for the parties to create demonstratives at the pre-trial hearing on September 9, 2019, and therefore overrules Defendants' objection.

### 6. Whether Plaintiffs May Recover for the Disputed Witness Costs

Defendants argue that Plaintiffs should not be permitted to recover certain costs paid to Dr. Dana Medlin and Mr. Thomas Eager. Defendants argue that the following costs related to Dr. Medlin were inappropriate: (1) flying "Business Select" to fly from Dallas to Houston to attend his deposition for $951.36; (2) spending $155.82 per night before taxes during his two night stay in Houston for his deposition in excess of the GSA statutory limit; (3) spending four days in attendance at trial at a statutory rate of $40 per day; (4) flying "Business Select" to Houston twice

during the trial at a cost of $533.96 round trip; and (5) spending four nights at a hotel at an average rate of $286 per night in excess of both the days needed for trial and the GSA statutory limit. As to Mr. Eager, Defendants argue that the following costs were inappropriate: (1) flying first class from Boston to Dallas for $1,517.91; and (2) spending $269.00 before taxes for a night at a hotel in excess of the GSA statutory limit. Plaintiffs do not contest that the hotel stays exceeded the statutory rate but do take issue with the other points raised by Defendants. The Court will consider the flights first, then the time by Dr. Medlin.

"A witness who travels by common carrier . . . shall utilize a common carrier at the most economical rate reasonably available." 28 U.S.C. § 1821(c)(1). Defendants contend that on the average day, flights from Dallas to Houston are available for as little as $220 round-trip and flights from Boston to Dallas are available for as little as $373.86 round trip. Plaintiffs argue that they were operating on late notice and could not have picked the cheapest flight. The Court agrees with Plaintiffs that the cost of Dr. Medlin's flights between Houston and Dallas, even using the 'Business Select' option on Southwest Airlines, is not unreasonable. Therefore, the Court overrules Defendants' objections as to those flights. On the other hand, the Court believes flying Mr. Eager first class to Dallas is an excessive expense, and not one permitted under 28 U.S.C. § 1821(c)(1). In a cursory search, the Court found round-trip, direct flights in the upcoming days between Boston and Dallas averaged approximately $600. Therefore, the Court adjusts the costs award by $917.91 for flights of Mr. Eager.

As to the costs related to Dr. Medlin staying extra days at the trial, the Court overrules Defendants' objections. During the trial, the city of Houston was sustaining the impact of Tropical Storm Imelda. For obvious reasons, the Court cut certain dates of trial short to ensure the jurors could get home safely. Other segments of testimony ran longer than expected as a result of the

weather, and these complications were not the result of any bad faith by the Plaintiffs. Therefore, the Court overrules these objections.

As Defendants have pointed out, the GSA per diem rates in Houston for the dates Dr. Medlin was here were $131.00 per night. Therefore, the Defendants' costs must be reduced by $49.64 for Dr. Medlin's hotel stays during his deposition and $620.00 for his hotel stays during trial. Defendants have also pointed out that the GSA per diem rates in Dallas for the dates Mr. Eager was there were $151.00 per night. Therefore, the Defendants' costs must be reduced by $118.00 for Mr. Eager's hotel stay in Dallas. *See Structural Metals, Inc. v. S & C Elec. Co.*, No. SA-09-CV-984-XR, 2013 WL 3790450, at *5 (W.D. Tex. July 19, 2013) (adjusting hotel costs to be consistent with the GSA per diem rate pursuant to 28 U.S.C. § 1821(d)).

In sum, Defendants' costs must be reduced by $1705.55 for costs related to witnesses.

### 7. Whether Plaintiffs May Recover for the Costs Related to Printing

Defendants argue that Plaintiffs should not be permitted to recover the costs for printing four large trial notebooks and other categories like the costs of printing research and case authority. Plaintiffs counter that the size of the trial notebooks were reasonable considering the complexity of the case and the amount of documents produced in discovery. Further, Plaintiffs argue that the research and case authority is a mere fraction of the overall printing cost. "Printing and copy costs are recoverable under § 1920 if they were necessarily obtained for use in the litigation." *Castone Corp. v. Advanced Cast Stone, Inc.*, No. 1:10CV287-HSOJMR, 2012 WL 13018538, at *7 (S.D. Miss. Aug. 8, 2012) (citing 28 U.S.C. § 1920(3), (4)). "District courts have great latitude in making the[] determination" as to whether certain photocopying is necessary, especially "in light of the circumstances of [a] complex case." *United States ex rel King v. Solvay Pharm., Inc.*, 871 F.3d 318, 336 (5th Cir. 2017). The Court does not believe that any of Plaintiffs' printing costs should be reduced. The complexity of the case and the legal issues required both large volumes of exhibits

and many instances of furnishing the Court with copies of cases. Therefore, the Court overrules Defendants' objection.

### 8. Whether Plaintiffs May Recover for the Costs Related to Printing

Finally, Defendants argue that Plaintiffs should not be permitted to recover e-discovery costs for optical character recognition ("OCR") and costs relating to "Prepare Data, Text, Images" and "Prepare Native Files." Plaintiffs respond that these e-discovery costs were necessary in order to comply with the discovery requests made by Defendants. In situations where a party has requested discovery take a specific form, courts have spurned the requesting party's objection that the cost could not be recovered. *United States ex rel King v. Solvay Pharm., Inc.*, No. CV H-06-2662, 2016 WL 3523873, at *13 (S.D. Tex. June 28, 2016). The Court overrules Defendants' objections.

### 9. Total Costs Due to Plaintiff

Therefore, Plaintiffs' motion for costs is granted in part and denied in part. In total, the Court will decrease the Plaintiffs' requested costs by $12,557.09. The fees the Court is decreasing were shared equally by the Plaintiffs. *See* (Doc. Nos. 347 & 348). Therefore, the Court will subtract $6,278.55 from each party. Boltex is thus entitled to an award of $62,793.92 of costs. Weldbend is entitled to $63,721.61 of costs. These are recoverable under the Lanham Act.

### D. Whether Plaintiffs May Elect to Recover State Punitive Damages in Addition to Lanham Act Damages

In the Court's interlocutory order, the Court found that "[w]hile Plaintiffs have received favorable jury findings on all claims, they are not entitled to multiple recoveries for the same loss. Therefore, Plaintiffs must elect between the remedies upon which they have prevailed." (Doc. No. 337 at 2). The Court then instructed Plaintiffs that they may "elect under Texas common law to recover actual damages from May 5, 2015 to May 31, 2019 plus punitive damages, or they can

elect to recover under the Lanham Act for damages from May 5, 2013 to May 31, 2019 [including disgorgement], but this election would not include an award of punitive damages." *Id.* at 3. In a letter brief, Plaintiffs objected to this election requirement, arguing that they should be entitled to elect under both Lanham Act compensatory damages *and* Texas common law punitive damages. Such an award—encompassing lost profits, disgorgement, costs, *and* punitive damages—is permitted, Plaintiff argues, "because the Lanham Act's remedies are compensatory and not punitive, and punitive damages are by definition non-compensatory, [and thus] an award of both in a single action is nonduplicative." (Doc. No. 344 at 1). In response, Defendants argue that the Fifth Circuit has held that it is impermissible under Texas law to pick and choose damage elements arising under different theories.

The Court agrees with the Defendants here. Particularly instructive in this case is the Fifth Circuit's decision in *American Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 336 (5th Cir. 2008). There, the court held that if it permitted a plaintiff to recover damages under one theory, while recovering attorney's fees under another, then the court "would be picking and choosing from damage elements arising under different theories, which is impermissible under Texas law." The same logic applies here, where Plaintiffs are attempting to choose the compensatory damages allowed by the Lanham Act which permits the Plaintiffs to recover lost profits, disgorgement, and costs, while also choosing the exemplary damages element of their Texas common law claim. Such a finding should not be a surprise to Plaintiffs whose counsel represented to the Court at trial that they understood they would need to make an election as they sought recovery under separate theories if they prevailed on them all. Morning Session, Tr. Day 7, 5:1–5 ("**Mr. Perloff:** I agree, and I – I believe we would have to do – and we would acknowledge that we would need to do an election on the damages because that'll happen even [sic] any time if you have . . . separate

theories."). Therefore, the Court denies Plaintiffs' request to reconsider its ruling on election of remedies and awards damages as elected in Plaintiffs' letter to the Court.

**IV.    Conclusion**

This Court denies Plaintiffs' motion for reconsideration of its previous interlocutory order. (Doc. No. 342). The Court also grants in part and denies in part Plaintiffs' motion for costs. (Doc. Nos. 347 & 348). The Court also denies Plaintiffs' motion for reconsideration of the Court's ruling concerning election of remedies. (Doc. No. 344).

Plaintiffs have informed the Court that they will elect for the "highest monetary award allowed under the framework adopted by the Court after the Court rules on all of the pending arguments presented by Plaintiffs." (Doc. No. 344 at 4). Consistent with this request, the Court awards $3,728,793.92 to Plaintiff Boltex and $3,067,721.61 to Plaintiff Weldbend pursuant to their Lanham Act claims.[8]

SIGNED at Houston, Texas this 7th day of February, 2020.

Andrew S. Hanen
United States District Judge

---

[8] The Court notes that had the Plaintiffs elected to proceed under their state law claims or if an appellate court finds that Plaintiffs can recover under the Lanham Act plus state court punitive damages, the Court would have ordered punitive damages in the amount of $800,000.00 for Boltex and $400,000.00 for Weldbend due to the reductions required by Texas's cap on punitive damages. The actual damages pursuant to their Texas common law unfair competition claims are $400,000.00 for Boltex and $200,000.00 for Weldbend.